STATE OF CONNECTICUT *v.* EUFEMIO VASQUEZ
(AC 20444)

Foti, Mihalakos and Flynn, Js.

Argued November 27, 2001—officially released February 12, 2002

*Kirstin B. Coffin,* for the appellant (defendant).

*Robert M. Spector,* deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Rachel M. Baird,* former assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Eufemio Vasquez, appeals from the judgment of conviction, rendered following a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[1] and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48.[2] On appeal, the defendant claims that the court improperly (1) refused to admit into evidence a certain redacted statement, (2) denied his motion for a judgment of acquittal as to counts one, two and three of the information, (3) instructed the jury on the principle of liability of coconspirators and on the principle of accessorial liability and (4) denied his motion to strike the jury array. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early evening of March 31, 1998, Gloryann Lopez left her apartment building on Zion Street in

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

Hartford and walked to a local grocery store. As she was leaving the store, she and others observed two individuals, known to her as Jorge Martinez and "Sharat," fighting in the street. Martinez eventually got into his car and fled the scene. As he did so, he crashed into a parked car and yelled to Sharat, "We'll be back, motherfuckers."

A short while after returning home, Lopez and several of her friends, including Obexsa Ruiz, Lisa Rosario and Jessica Maisonet, decided to walk to another nearby store located on Wolcott Street. Lopez and the others had heard a rumor that a fight would occur at that store. As they walked along Park Street, a blue van drove past them toward their destination. The defendant and Martinez were in the van. The women were familiar with the defendant, and both he and Martinez spoke to them in a rude manner. At some point, the women in the group learned that the fight was not going to occur and they proceeded to the front stairs of an apartment building at 597 Zion Street, where others eventually joined them.

At approximately 9 p.m., the same blue van that the women had seen earlier quickly approached and came to an abrupt stop in front of the apartment building. Its headlamps were turned off. As the people congregated in the front of the building began to flee, the defendant and Martinez exited the van via a sliding side door and, along with a third man who exited the van via the passenger door, started firing shots at the members of the group. One of the males who had been standing in front of the apartment building with the others drew a gun and returned fire in the direction of the van. The operator of the van also exited the van and began firing his gun in the direction of individuals who were located on the opposite side of Zion Street.

Lopez found safety just inside the front door of the apartment building. From this vantage point, she

observed the defendant and Martinez standing in front of the van firing shots in the direction of the front stairs to that building. She also observed the defendant and Martinez run from the scene when the shooting ceased. When it seemed safe to do so, Lopez and others opened the front door of the building. They found Rosario badly wounded. A bullet remained lodged in one of her kidneys and she had lost a substantial amount of blood. Emergency medical personnel responded to the scene, treated Rosario and transported her to the hospital. She remained hospitalized for several days prior to being released. Additional facts will be set forth as necessary.

I

The defendant first claims that the judgment should be reversed because the court improperly refused to admit into evidence a certain redacted statement. We disagree.

During Lopez' cross-examination, she testified that she reported to the police that she had seen the defendant in a van on Park Street prior to the shooting. After the defendant's counsel asked Lopez to review her statement to the police, she testified that the statement did not reflect that she had reported this observation to the police. Following Lopez' redirect examination, defense counsel offered as an exhibit a redacted version of the statement that Lopez had provided to the police. The redacted version of Lopez' statement omitted Lopez' description of the shooting, her recollection of Rosario's injuries and her later identification of the defendant as the shooter.

The defendant's counsel argued that the redacted statement was admissible as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defense argued that it was relevant and admissible as a prior inconsistent statement

because, if Lopez had seen the defendant prior to the shooting as she testified, such recollection should have been in her statement to the police, which purported to contain all of the information and observations that Lopez deemed relevant to the shooting. The defendant's counsel argued that the omitted parts of Lopez' statement did not fall under *Whelan* because they were not inconsistent with her testimony. The state objected to the admission of the redacted statement, arguing primarily that if the defense wanted the court to admit the statement into evidence in part, the court should admit the entire statement so that the jury would have the benefit of evaluating any such omission from a review of the entire document.

The court did not admit the redacted statement into evidence, despite the fact that it agreed that the omission in the statement of facts that Lopez included in her testimony at trial demonstrated an inconsistency. The court noted that it would be inclined to allow the entire statement as an exhibit but that several considerations weighed against admitting the redacted version into evidence. The court noted that Lopez' written statement was two pages in length and that the defendant's proposed redaction of critical information that Lopez provided to the police concerning the shooting from the statement "might very well serve to confuse the jury [into] concluding that she did not give a full statement on April 1, 1998, regarding other facts, namely, what she testified to concerning what happened [at the scene of the shooting itself]." The court further noted that the jury might read the redacted statement, recognize that the crux of her testimony about the shooting itself is not reflected therein, and be confused as to how to assess Lopez' testimony in toto.

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse

of discretion and a showing by the defendant of substantial prejudice or injustice. . . . It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . Sound discretion, by definition, means a discretion that is not exercised arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law. . . . And [it] requires a knowledge and understanding of the material circumstances surrounding the matter . . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Lomax*, 60 Conn. App. 602, 607–608, 760 A.2d 957, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000).

In *State* v. *Whelan*, supra, 200 Conn. 753, our Supreme Court adopted a rule allowing for "the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination."[3] The Supreme Court deemed this type of prior statement to be an exception to the rule against hearsay under such circumstances. The Supreme Court noted that this rule will afford a jury in such a case the opportunity to assess a witness' credibility after the witness is confronted with an alleged prior inconsistent statement. As our Supreme Court reasoned, given the opportunity for meaningful cross-examination of such a witness, the witness "will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all." Id., 750. After this type of examination, the jury can draw

---

[3] This rule is incorporated in Connecticut Code of Evidence § 8-5 (1).

whatever conclusions concerning the witness' testimony that it deems to be appropriate.

For purposes of our analysis, we note the distinction between those prior statements that contain contradictory representations and those prior statements that are inconsistent because of a declarant's omission of certain facts. Concerning statements in the latter category, the rule is that "[i]f a former statement fails to mention a material fact presently testified to, which it should have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent." (Internal quotation marks omitted.) *State* v. *Reed*, 174 Conn. 287, 303, 386 A.2d 243 (1978); see also *State* v. *Prutting*, 40 Conn. App. 151, 158, 669 A.2d 1228, cert. denied, 236 Conn. 922, 674 A.2d 1328 (1996).

When a prior statement is inconsistent with a witness' present testimony because it *contradicts* the witness' present testimony, the introduction of only as much of the prior statement that is contradictory is usually sufficient to afford the jury a basis on which to evaluate the claimed inconsistency. When a party wants to impeach a witness with a prior inconsistent statement *on the basis of an omission* in that statement, however, the court must determine how much of that prior statement is relevant to afford the jury a basis on which to evaluate the claimed inconsistency.

In making this determination, it is natural for the court to consider the relevance of the alleged prior inconsistency to the issues at trial, as well as the likely effect of such evidence on the jury. The court should avoid admitting evidence that has a tendency to confuse or mislead the jury. This duty includes declining to admit a prior statement that is likely to mislead the jury given the circumstances under which the declarant made such a statement[4] or a prior statement that

---

[4] See *State* v. *Mukhtaar*, 253 Conn. 280, 306–307, 750 A.2d 1059 (2000).

deprives the jury of the necessary context of a claimed omission within that statement.[5] This type of determination is largely dependent on the unique circumstances in each case and, as with evidentiary issues in general, is best left to the sound discretion of the trial court.

In the present case, the court reviewed the redacted version of the statement that the defendant sought to introduce as an exhibit. The court explained its concern that the redacted statement had, in its view, a tendency to confuse or mislead the jury as it evaluated Lopez' testimony. Although the court recognized that the prior statement was inconsistent, it stated that the jury might mistakenly believe that Lopez did not provide a complete statement to the police as to matters that the defendant sought to redact from the statement. The court performed its function of evaluating the proffered evidence in light of its likely effect on the jury, and its analysis reflects the exercise of sound discretion.

In any event, we also conclude that the defendant has failed to demonstrate that he suffered substantial prejudice or injustice as a result of the court's ruling. The record reflects that defense counsel inquired of Lopez as to whether she reported having seen the defendant on Park Street prior to the shooting. Lopez answered in the affirmative. Defense counsel then

---

[5] The principle of affording the fact finder the proper context in which to consider statements is codified in Connecticut Code of Evidence § 1-5, which provides: "(a) Contemporaneous introduction by proponent. When a statement is introduced by a party, the court may, and upon request shall, require the proponent at that time to introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered contemporaneously with it.

"(b) Introduction by another party. When a statement is introduced by a party, another party may introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered with it."

handed a copy of Lopez' police statement to her and asked her to review it. Defense counsel thereafter elicited from Lopez that her statement did not reflect that she reported this information to the police. Given the fact that the defendant more than adequately pointed out the inconsistency to the jury, we conclude that the court's ruling did not cause him to suffer substantial prejudice or injustice. See *State* v. *Williams*, 203 Conn. 159, 186–87, 523 A.2d 1284 (1987).

## II

The defendant's next claim challenges the sufficiency of the evidence underlying his conviction. Specifically, he claims that the court improperly denied his motion for a judgment of acquittal as to counts one, two and three of the information.[6] We disagree. Count one charged the defendant with the crime of assault in the first degree in violation of § 53a-59 (a) (1). Count three charged the defendant with the crime of conspiracy to commit assault in the first degree in violation of §§ 53a-59 (a) (1) and 53a-48. We need not address the defendant's claim to the extent that it involves count two, which charged him with the crime of assault in the first degree in violation of § 53a-59 (a) (5). The defendant was not convicted on that count.[7]

[6] The record reflects that, at the close of the state's case, the defendant moved for a judgment of acquittal pursuant to Practice Book § 42-41 as to all counts of the information. The court denied the motion as to counts one, two and three of the information, but granted it as to count four, which had charged the defendant with criminal possession of a pistol in violation of General Statutes § 53a-217c.

After the jury rendered its verdict, the defendant once again moved for a judgment of acquittal pursuant to Practice Book § 42-51 as to counts one and three of the information. The court denied that motion.

[7] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm." Before the court submitted the case to the jury, it expressed reservations on double jeopardy grounds with submitting both counts one and two to the jury. The defendant thereafter moved to dismiss count one of the information on those grounds.

"The standard of appellate review of a denial of a motion for a judgment of acquittal has been settled by judicial decision. . . . The issue to be determined is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict." (Citations omitted.) *State* v. *Candito*, 4 Conn. App. 154, 156–57, 493 A.2d 250 (1985).

We undertake our analysis of this issue by setting forth each essential element of the crimes with which the defendant was charged and determining whether the state has proven each element beyond a reasonable doubt. In undertaking this task, we are mindful that "although it is within the province of the jury to draw reasonable, logical inferences from the facts proven, they may not resort to speculation and conjecture." (Internal quotation marks omitted.) *State* v. *Giguere*, 184 Conn. 400, 403, 439 A.2d 1040 (1981). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 655, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

The court did not grant the defendant's motion. Instead, the court allayed its concerns by instructing the jury that if it found that the defendant had violated § 53a-59 (a) (1), as alleged in count one, it did not have to consider count two. Accordingly, the jury rendered a verdict as to counts one and three only.

## A

We first consider the defendant's claim that the evidence was insufficient to sustain his conviction of assault in the first degree.

To sustain a conviction under § 53a-59 (a) (1), the state needs to demonstrate with proof beyond a reasonable doubt that a defendant (1) intended to cause serious physical injury to another person, (2) caused such injury to such person or to a third person and (3) did so by means of a deadly weapon or a dangerous instrument. In the present case, although the state charged the defendant as a principal actor under the statute, the court properly instructed the jury that it could find the defendant guilty under a theory of accessorial liability pursuant to General Statutes § 53a-8.[8] See part III B of this opinion.

Accordingly, the state did not need to prove that the defendant, acting as an accessory, actually inflicted the victim's injuries. The state needed to prove that (1) the defendant intended to cause serious physical injury to another person, (2) the defendant either caused such physical injury to such person or solicited, requested, commanded, importuned or intentionally aided another person to cause such physical injury and (3) such injury was inflicted with the use of a deadly weapon or a dangerous instrument.

Examining the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence to convict the defendant of assault in the first degree as an accessory. Lopez testified that she knew the defendant, she had dated him and

---

[8] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

remained friends with him for many years. She recalled how she had seen him in the blue van before the shooting as she walked along Park Street. She testified that the interchange between herself and the other women she was with on Park Avenue led her to believe that "somethin' was gonna happen." She testified that the same blue van approached the scene of the shooting several hours later and that she saw the defendant and Martinez exit that van. She recalled that the defendant was holding a gun.

Lopez testified that as soon as the defendant and Martinez exited the van, "that's when they started shooting." She heard the gunshots and saw flashes of light coming from the guns that the defendant and Martinez were firing. She recalled that the defendant was shooting at the people who had congregated on the steps of 597 Zion Street. Lopez testified that although she had taken refuge just inside the apartment building, she observed the defendant's subsequent actions and that after the shooting had ceased, the van sped away without the defendant and the defendant fled on foot.

Ruiz corroborated the crux of Lopez' testimony during her examination. She also testified to having seen the blue van on Park Street before the shooting and recalled that several people were in the van and that they made rude comments to her and the other women who had been walking with her. She identified the defendant as one of the van's occupants. She testified that she had known the defendant for some time. Likewise, she recalled seeing the same van pull up to the scene of the shooting in front of 597 Zion Street. She observed that the defendant and Martinez exited the van and that they had guns and "started shooting." Like Lopez, Ruiz testified about finding Rosario on the front porch of the apartment building after the shooting, badly wounded.

Rosario also testified that she knew the defendant. Like the other witnesses, she recalled seeing him in the van before the shooting as she walked along Park Street. She recalled that the defendant said something to her at that time. She also recalled sitting in front of 597 Zion Street when the same van approached the scene. She testified that shots were fired from the direction of the van and that she could not see who had fired the shots. She then testified about the injuries she sustained.

On the basis of this testimony, as well as other evidence adduced at trial, the jury reasonably could have found beyond a reasonable doubt that the defendant intended to cause physical injury to another person. He exited the van carrying a gun and fired the gun at the persons who had congregated in front of 597 Zion Street. He had seen many of those same people just hours earlier as he rode in the same van down Park Street. As this court has stated: "Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . It is axiomatic that a factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Citations omitted; internal quotation marks omitted.) *State* v. *Madagoski*, 59 Conn. App. 394, 399–400, 757 A.2d 47 (2000), cert. denied, 255 Conn. 924, 767 A.2d 100 (2001).

The state did not need to prove that the defendant actually caused serious physical injury to the victim. "It is enough for the state to prove that the defendant, acting with the intent to cause serious injury to [the

victim], solicited, requested, commanded, importuned or intentionally aided another person to cause serious physical injury to [the victim] by means of a dangerous weapon." (Internal quotation marks omitted.) *State* v. *Fruean*, 63 Conn. App. 466, 475–76, 776 A.2d 508, cert. denied, 257 Conn. 908, 782 A.2d 135 (2001).

The testimony elicited during trial, if credited by the jury, clearly established that the defendant was one of the shooters. He and Martinez exited the van, carrying guns, and fired shots in the direction of the individuals who were congregated at that place. The defendant, at the very least, intentionally aided the commission of the crime. The testimony regarding the earlier encounter between the defendant and the witnesses walking along Park Street, the way in which the same van approached the scene of the shooting, and the defendant's behavior in exiting the van with Martinez, firing at the victim and running from the scene all support a finding that he intentionally aided in the commission of the crime that inflicted Rosario's injuries.

"Since under our law both principals and accessories are treated as principals . . . if the evidence, taken in the light most favorable to sustaining the verdict, establishes that [the defendant] committed the [crime] charged or did some act which forms . . . a part thereof, or directly or indirectly counseled or procured any persons to commit the offenses or do any act forming a part thereof, then the convictions must stand." (Internal quotation marks omitted.) *State* v. *Fuller*, 58 Conn. App. 567, 574, 754 A.2d 207, cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000); see also General Statutes § 53a-8.

Last, there can be no disagreement that the injuries inflicted on the victim were caused with a deadly weapon. The evidence overwhelmingly showed that the defendant and the other shooters used guns in their

attack, and the medical reports as well as other eyewitness testimony concerning Rosario's injuries support a finding in this regard.

B

We next consider the defendant's claim that the evidence was insufficient to support his conviction of conspiracy to commit assault in the first degree.

To sustain a conviction under § 53a-48 (a), the state needs to prove beyond a reasonable doubt (1) that a defendant intended that conduct constituting a crime be performed, (2) that he agreed with one or more persons to engage in or cause the performance of such conduct and (3) that he or any one of those persons committed an overt act in pursuance of such conspiracy. General Statutes § 53a-48 (a). Conspiracy "is a specific intent crime, with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense." (Internal quotation marks omitted.) *State* v. *Kenney*, 53 Conn. App. 305, 312, 730 A.2d 119, cert. denied, 249 Conn. 930, 733 A.2d 851 (1999).

After carefully reviewing the evidence adduced at trial, we conclude that there was ample evidence, both direct and circumstantial, to demonstrate that the defendant engaged in a conspiracy to commit the crime of assault in the first degree. In support of our conclusion, we return to events that happened earlier in the day on the day of the shooting. Lopez testified that she and others observed Martinez fighting at a local grocery store with a man known to her as Sharat. As Martinez fled the scene, he drove his car into another parked

car and angrily threatened Sharat, stating, "We'll be back, motherfuckers."

A few hours after this confrontation, Lopez and her friends saw Martinez as they walked along Park Street. At this time, Martinez was in a van with several of his acquaintances, including the defendant. Someone in the van made rude comments to the women who were walking, and the van continued on. Lopez testified that before the shooting occurred, several people had congregated directly in front of or near 597 Zion Street. One of those individuals was a man who had been at the prior confrontation between Martinez and Sharat. Ruiz testified that one of the men who had been standing near the group on the sidewalk returned gunfire at the defendant and the others who came out of the van. She also testified about other males who were returning fire from the other side of the street.

From these facts, as well as others adduced at trial, the jury could have found beyond a reasonable doubt that Martinez conspired with the defendant and others to exact retribution on those who had been involved in the fight with him earlier in the day. In any event, the choreographed sequence of events surrounding the shooting is evidence of a planned attack on the victim and others. The van approached the scene at a high rate of speed; it came upon the scene fast enough that several individuals ran for safety even before the actual shooting commenced. The van's headlamps were not on, despite the fact that it was dark outside. The defendant and other shooters exited the van wearing dark colored gear, which a witness described as "hoodies." They were armed and quickly emerged from the van and began firing at their targets. At the end of the shooting, the van sped off, and the defendant and Martinez fled on foot.

The overwhelming evidence clearly demonstrated that the defendant was part of a conspiracy and that

he intentionally aided and participated in a planned attack aimed at causing serious physical injury to another person. The defendant achieved the result he intended. We conclude that the state proffered more than sufficient evidence to demonstrate that the defendant had agreed to conspire and that the object of the conspiracy was to commit the crime of assault in the first degree.

## III

The defendant's next two claims are related in that they both challenge the propriety of specific instructions in the court's jury charge. The defendant first claims that the court improperly delivered an instruction in regard to the liability of coconspirators under the doctrine set forth in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). Second, the defendant claims that the court improperly delivered an instruction in regard to accessorial liability. We disagree with both claims and address each claim in turn.

## A

The court instructed the jury as follows: "I shall now instruct you on the law of accessory or accomplice responsibility, which I referred to a moment ago.

"First, you must be convinced beyond a reasonable doubt that the defendant intended to cause serious physical injury to another person. However, it makes no difference whether Lisa Rosario's injuries were actually inflicted by the defendant's firing of a gun or by the gun of another person if the defendant was acting with the other person in a common purpose to carry on the activity of the shooting as I will charge you."

The defendant classifies the foregoing instruction as a *Pinkerton* instruction and argues that the court

improperly delivered it because it was not warranted by the facts elicited at trial.

We note that the challenged instruction dealt with the principle of accessorial liability,[9] not liability of coconspirators under *Pinkerton*. The court, however, did instruct the jury regarding the liability of coconspirators under *Pinkerton*. It suffices to note that the record reflects that the defendant took an exception to the court's use of the word "killing" in that instruction. The court realized that it had mistakenly used the word, returned the jury to the courtroom and corrected the instruction as the defendant had requested. The defendant did not object to the *Pinkerton* instruction in any other regard.

The defendant now claims that the court improperly delivered a *Pinkerton* instruction in the first instance because the facts elicited at trial did not warrant such an instruction. As we stated earlier, the defendant did not object to the court's charge on this ground. The defendant does not seek either plain error review; Practice Book § 60-5; or review of this unpreserved claim under the doctrine for reviewing such claims set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Consequently, we decline to review this claim because the defendant neither raised it sufficiently at trial nor properly preserved it for appellate review. *State* v. *Andresen*, 256 Conn. 313, 324, 773 A.2d 328 (2001); *State* v. *Krzywicki*, 39 Conn. App. 832, 838, 668 A.2d 387 (1995).

## B

The defendant's next claim focuses on the court's instruction with regard to accessorial liability. The court read the relevant legislative enactment, § 53a-8

---

[9] We will address the defendant's challenge to the court's accessorial liability instruction in part III B of this opinion.

(a), as set forth in footnote 8 of this opinion, and marshaled the evidence relevant to that legal principle. The defendant does not claim that the court misstated the law, and the record reflects that the court accurately instructed the jury on accessorial liability. Instead, the defendant challenges the propriety of delivering the instruction at all. The defendant concedes, as he must, that he did not take exception to this instruction and seeks appellate review of this claim under *State* v. *Golding*, supra, 213 Conn. 239–40.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial. . . . This court may dispose of the claim on any one of the conditions that the defendant does not meet." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 653, 783 A.2d 511 (2001).

The defendant argues, and the record reflects, that the state charged the defendant solely as a principal in its long form information and that the court accepted his not guilty plea as to those charges. The defendant points out that the state first discussed the defendant's guilt as an accessory to the crimes charged when it opposed his motion for a judgment of acquittal at the close of the state's case. He argues that the court's charge deprived him of his right to present a defense,

as guaranteed by the sixth amendment to the United States constitution,[10] which is made applicable to the states through the fourteenth amendment,[11] and under the due process clause of article first, § 8, of the constitution of Connecticut.[12]

Although the record is adequate for our review of this claim and the claim is of constitutional magnitude, the claim nonetheless fails under the third prong of *Golding* because the defendant has failed to demonstrate that a constitutional violation clearly exists and clearly deprived him of a fair trial. It is of fundamental importance that the state advise defendants of the nature and cause of the accusations against them. It is well settled, however, that "[u]nder Connecticut law, a defendant may be convicted as an accessory even though he was charged only as a principal as long as the evidence presented at trial is sufficient to establish accessorial conduct." (Internal quotation marks omitted.) *State* v. *James*, 247 Conn. 662, 679, 725 A.2d 316 (1999).

A defendant cannot be convicted of "being an accessory." Proving guilt as an accessory under § 53a-8 is an

---

[10] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

[11] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

[12] The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . and in all prosecutions . . . to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

alternative way in which the state may demonstrate a defendant's liability for a criminal act. *State* v. *Hopkins,* 25 Conn. App. 565, 568–69, 595 A.2d 911, cert. denied, 220 Conn. 921, 597 A.2d 342 (1991). "Liability does not turn on whether he was found to be a 'principal' or an 'accessory.' " *State* v. *Gamble,* 27 Conn. App. 1, 10, 604 A.2d 366, cert. denied, 222 Conn. 901, 606 A.2d 1329 (1992). Accordingly, "a defendant who is charged with an offense should be on notice that he may be convicted as an accessory." *State* v. *Hopkins,* supra, 569.

Nevertheless, due process considerations preclude a court from instructing a jury that it may convict a defendant under a theory of accessorial liability in certain circumstances. Inherent in the constitutional mandate that a defendant be advised of the "nature and cause" of the accusations against him is that the defendant be on notice of the nature of the state's prosecution. The state cannot present its case on the theory of principal liability and then, without providing notice to the defendant, seek near the conclusion of the trial to convict the defendant under a theory of accessorial liability.

The defendant relies on *State* v. *Steve,* 208 Conn. 38, 45–46, 544 A.2d 1179 (1988), in support of his claim. In *Steve,* the state's bill of particulars charged the defendant as a principal actor for the crimes of robbery in the first degree and assault in the first degree. Id., 41. After the state concluded its case-in-chief, the defendant took the stand in his own defense and testified that a second person had actually shot the victim and taken his property. Id., 42. A second defense witness corroborated this testimony and testified that she had seen the defendant and the actual shooter immediately before and after the shooting. Id. Before closing arguments, the state's attorney advised the defendant that the state would request a charge on accessorial liability. The court complied with that request. Id., 42–43.

In *Steve*, the defendant argued on appeal that the trial court improperly instructed the jury on the theory of accessorial liability. The Supreme Court agreed, noting that "[t]he purpose of a bill of particulars is to inform the defendant of the charges against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise." Id., 44. The Supreme Court found it significant that the bill of particulars did not inform the defendant that the state would seek a conviction on the basis of accessorial liability. Likewise, the Supreme Court found it "significant that the state presented no evidence in its case-in-chief suggesting that the defendant had acted as an accomplice." Id., 46. On the basis of the variation between the court's charge and the bill of particulars and the fact that the state did not present evidence of accessorial conduct during its case-in-chief, our Supreme Court concluded that the trial court had improperly instructed the jury in this regard. Id.

Our appellate courts have had occasion to revisit similar issues in cases argued and determined subsequent to *Steve*. The defendant in *State* v. *Williams*, 220 Conn. 385, 388, 599 A.2d 1053 (1991), claimed on appeal that the trial court had improperly instructed the jury on the principle of accessorial liability. Our Supreme Court rejected the claim for two reasons. First, the court noted that the information sufficiently alerted the defendant to the fact that he could be tried as an accessory to the crime. Id., 390. Second, and most important to our analysis, the Supreme Court noted that, unlike in *Steve*, "the defendant . . . was specifically put on notice . . . *prior to beginning his defense*, that the issue of accessorial liability was still in the case." (Emphasis added.) Id.

In *State* v. *Hopkins*, supra, 25 Conn. App. 565, this court rejected a similar claim. We reasoned that the court had not improperly instructed the jury on the

principle of accessorial liability for several reasons. Id., 568–70. First, the defendant in that case did not submit a request for a bill of particulars after the state filed a substitute information. Id., 569. Second, the character of the evidence adduced during the state's case-in-chief "should have alerted [the defendant] to the heightened possibility that he could be convicted as an accessory." Id. Third, the defendant was on notice after the victim testified that the court would instruct the jury on the theory of accessorial liability.

In *State* v. *Prat*, 66 Conn. App. 91, 784 A.2d 367 (2001), this court rejected a similar claim, relying partly on the fact that the trial court had informed counsel prior to the beginning of closing arguments that it intended to instruct the jury on accessorial liability. We observed that "[t]he defendant had the same opportunity as the state to prepare his final arguments to the jury on the subject of his liability as an accessory." Id., 97.

We conclude that the present case is distinguishable from *Steve* and that it is factually similar to *Hopkins*, *Williams* and *Prat*. In the present case, the state filed a long form information and the record does not reflect that the defendant sought a bill of particulars.[13] The information charged that the defendant caused injury to the victim by means of a deadly weapon. It also charged that the defendant entered into a conspiracy with one or more persons to commit the crime of conspiracy to commit assault in the first degree. To convict the defendant of that crime, it would not be necessary for the state to prove that the defendant had fired the shot that injured the victim. It follows, therefore, that the defendant was on notice, at least as to that charge, that the state could seek his conviction on the basis of his concerted actions with another person.

---

[13] A defendant may, pursuant to Practice Book §§ 41-20 and 41-21, seek additional information about the charges against him by requesting a bill of particulars.

The record also reflects that the state presented evidence in its case-in-chief to support the defendant's conviction under the theory of accessorial liability. The nature of the state's case should have alerted the defendant to the high likelihood that the state could seek a conviction on that ground. The prosecutor specifically stated that the state was prosecuting its case on the principle of accessorial liability before the defense began its case. Our case law makes clear that the substance of the charging document alone is not dispositive of this issue. The nature of the state's evidence as to the commission of the crime, the fact that the defendant knew prior to presenting his defense that the state intended to prosecute under this theory of liability and the fact that the defendant knew well in advance of closing arguments that the state would seek an instruction in that regard greatly diminish the strength of the defendant's claim that the court's instruction caused him undue surprise and deprived him of his right to present a defense.

For these reasons, we conclude that the defendant has failed to demonstrate that a constitutional violation clearly exists that clearly deprived him of a fair trial. Accordingly, his claim fails under *Golding*'s third prong.

IV

The defendant's final claim is that the court denied him his right to an impartial jury comprised of a fair cross section of the community when it improperly denied his motion to strike the jury array. We disagree.

The record reveals the following additional facts that are pertinent to this claim. Jury selection in the present case occurred over the course of four days: August 26, 27, 30 and 31, 1999. The clerk brought two panels of potential jurors, consisting of fifty venirepersons, to the courtroom for voir dire examination. The parties concluded selection of a jury of six, with two alternates,

on August 31, 1999. On the morning of August 31, 1999, after the parties selected six jurors but before the parties examined returning venirepersons in the selection of alternates, the defendant filed a motion entitled "Challenge to Jury Array." In that motion, the defendant claimed that (1) as a Hispanic male, he was a member of a distinctive group in his community, (2) the venire panels from which his jury was selected did not reasonably represent the percentage of Hispanic individuals in his community, (3) the underrepresentation of Hispanic individuals from the venire panels was the result of a systematic exclusion of members of that group from the jury selection process and (4) he was entitled to an evidentiary hearing to support his claim of discrimination.

The court inquired of the defendant's counsel as to how she wanted to proceed in light of her motion. The defendant's counsel represented that she was not prepared to argue the motion at that time and that she wanted only to preserve the issue on her client's behalf. She also noted that the racial or ethnic composition of any additional venire panels, should such panels be necessary, might render her motion moot. The court instructed the parties to resume jury selection, and the parties thereafter selected alternate jurors from the group of returning venirepersons, obviating the need to summon an additional group of venirepersons to the courtroom.

The court scheduled the trial to begin on September 15, 1999, and instructed the selected jurors to report for trial on that date. The record reflects that the defendant filed a "Motion to Strike Jury Array" on September 14, 1999, in which he reiterated his constitutional challenge to the jury array and alleged that none of the jurors selected for his trial was Hispanic and that none of the fifty potential venirepersons assigned to his trial was Hispanic. He sought an order to "strike the array as

presently constituted" and an order that court officials "summon an array which fairly represents the community," and, in the alternative, a continuance to gather probative evidence in support of his claim, leave to file additional memoranda of law and a full evidentiary hearing.

On September 15, 1999, the court addressed the defendant's motion. The defendant's counsel represented that she believed that she would require a continuance of perhaps ninety days to gather the statistical evidence necessary to support her motion and admitted that she currently did not possess the specific statistical proof in support of her claim. The court stated that the defendant had not proved a prima facie case that the state had violated the fair cross section requirement.

The court thereafter discussed the defendant's request for a continuance to gather evidence in support of his claim. Foremost, the court expressed its concern over the timing of the defendant's motion, coming on the very eve of trial. The court noted that the parties already had used valuable court time to select a jury and that the jury was already at the courthouse and waiting to begin hearing evidence. The court discussed the practical considerations that weighed against imposing a lengthy trial delay on the jury. The court also noted that a lengthy delay would cause detriment to the defendant, who remained incarcerated, to the state and to the witnesses present at the courthouse. On these grounds, the court denied the defendant's request for a continuance and denied the defendant's motion to strike without prejudice. The court ruled that the trial would proceed but that the defendant would have the right to raise his constitutional challenge to the jury array in a motion for a new trial, if he were convicted. The court observed that in the event that the defendant was acquitted, the issue would be moot. The defendant's counsel agreed with the court that this

resolution would not deprive the defendant of any of his legal rights with regard to this claim.

The record further reflects that the jury convicted the defendant on September 30, 1999. The court scheduled a sentencing hearing for December 3, 1999. In the intervening two months, the defendant did not file a motion for a new trial, as the court and our rules of practice afforded him the right to do.[14] At the sentencing hearing, the court specifically inquired of the defendant's counsel as to whether she had filed a motion for a new trial. She indicated that she had not. The court also inquired of the defendant's counsel as to whether she wanted to revisit the claim. The defendant's counsel indicated that the claim was "not being pursued directly . . . ." The court stated: "I want the record clear that I am perfectly willing to take up [the constitutional challenge to the jury array]. . . . [T]he court indicated [before trial] that the court would be most willing to take up that issue on a motion for a new trial had one been filed. So, in the court's view that issue has been waived."

We conclude that the defendant waived this claim. Our appellate procedures do not permit an appellant to "pursue one course of action at the trial and then . . . to insist on appeal that the course which he rejected at the trial be reopened to him . . . ." (Internal quotation marks omitted.) *State* v. *Drakeford*, 202 Conn. 75, 81, 519 A.2d 1194 (1987). The court denied the defendant's claim without prejudice. The court afforded the defendant the opportunity to raise it again, and his counsel declined to do so. The defendant's counsel clearly represented her tactical decision not to pursue the matter.

Furthermore, the necessary result of the defendant's decision not to pursue the matter is that the record is

---

[14] See Practice Book §§ 42-53 and 42-54. On October 4, 1999, the defendant filed a motion for a judgment of acquittal on the ground of insufficient evidence.

devoid of any facts or legal conclusions for this court to review in regard to his claim. "Fair cross section claims are governed by a well established set of constitutional principles. In order to establish a violation of his federal constitutional right to a jury drawn from a fair cross section of the community, the defendant must demonstrate the following: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (Internal quotation marks omitted.) *State* v. *Gibbs*, 254 Conn. 578, 588, 758 A.2d 327 (2000). "The defendant bears the burden of establishing an adequate record to support a challenge to a jury array." *State* v. *Young*, 29 Conn. App. 754, 770, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993).

At trial, the defendant's counsel sought a continuance of as many as ninety days so that she could compile the necessary evidence in support of this claim. The parties and the court recognized that a full evidentiary hearing would be necessary if the defendant wanted to pursue the claim. The court denied the defendant's motion *without prejudice.* The court afforded the defendant the opportunity to prepare and to bring this claim before the court. He did not do so. The defendant now seeks review of this claim under *State* v. *Golding,* supra, 213 Conn. 239–40. The claim fails under *Golding*'s first prong because the record is not adequate for review. The defendant failed to pursue his claim and consequently, failed to surmount the considerable evidentiary burden necessary to prove it. See *State* v. *Tillman,* 220 Conn. 487, 491–99, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); *State* v. *Walthall,* 62 Conn. App. 99, 101–102,

767 A.2d 1257 (2001); *State* v. *Young,* supra, 29 Conn.
App. 770–71.

The judgment is affirmed.

In this opinion the other judges concurred.