STATE OF CONNECTICUT *v.* JOSE L. MORALES
(AC 22532)

Foti, West and Hennessy, Js.

Argued January 21—officially released August 3, 2004

*David V. DeRosa*, with whom, on the brief, was *Felix Esposito*, special public defender, for the appellant (defendant).

*Melissa L. Streeto*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Dennis J. O'Connor*, senior assistant state's attorney, and *Michael A. Gailor*, assistant state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Jose L. Morales, was charged by an amended long form information[1] on July 6, 2001, with burglary in the second degree in violation of General Statutes § 53a-102, two counts of burglary in the third degree in violation of General Statutes § 53a-103, five counts of larceny in the first degree in violation of General Statutes §§ 53a-119 and 53a-122 (a), kidnapping in the first degree in violation of General Statutes § 53a-92, kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a, robbery in the first degree in violation of General Statutes § 53a-134 (a) (3) and (4), assault in the second degree with a firearm in violation of §§ 53a-60 (a) (2) and 53a-60a (a), burglary in the first degree in violation of General Statutes § 53a-101, sale and possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), conspiracy to commit each of the previously stated substantive offenses in violation of General Statutes § 53a-48 and the corresponding statute for each offense, and two counts of violating the Corrupt Organizations and Racketeering Activity Act in violation of General Statutes § 53-395.

[1] The state's original long form information, dated March 14, 1994, contained twenty-one counts. The state, however, withdrew two counts, and the court granted the defendant's motion for a judgment of acquittal with respect to two additional counts. The state then filed the operative seventeen count long form information.

After a jury trial, the defendant was acquitted of burglary in the second degree, kidnapping in the first degree, kidnapping in the first degree with a firearm, robbery in the first degree, one count of larceny in the first degree, assault in the second degree with a firearm, one count of burglary in the third degree, and sale of narcotics and possession with intent to sell. A mistrial was declared as to three counts of larceny in the first degree. He was convicted of the remaining counts and sentenced to a total effective term of eight years incarceration, execution suspended after thirty months, followed by two years of probation.

On appeal, the defendant claims that the court improperly instructed the jury, thereby violating his due process rights under the state and federal constitutions, in its charges to the jury on accessorial liability and conspiracy. We affirm the judgment of the trial court.

The jury could have reasonably found the following facts. Between the summer of 1990 and the spring of 1992, the defendant and Ramon Valentin conspired to commit and then either committed or assisted each other in committing a series of criminal acts directed at Rey Luis Rivera. Rivera was the leader of a Hartford area heroin distribution ring. At all relevant times, the defendant was a homicide detective in the Hartford police department's crimes against persons unit, and Valentin was a detective for the state police statewide narcotics task force. The two men knew each other through the collaborative work of the two agencies in their attempts to combat narcotics related crimes.

In August or September, 1991, Valentin was introduced to Rivera's then girlfriend, Maria Figueroa. At Valentin's request, Figueroa provided Valentin with detailed information about Rivera and his heroin operation. Through Figueroa, Valentin learned that Rivera lived at the Days Inn on Brainard Road in Hartford (inn).

He also learned where Rivera purchased, processed and packaged the heroin for distribution and to whom he sold the finished product. Additional details included how much money Rivera made per week, that he stored his money in either a safe at his brother's home in New Haven or in a self-storage unit in Newington and the type of cars he drove. The defendant and Valentin used that information to carry out the three underlying criminal actions that formed the bases for the various other crimes and conspiracies alleged in the seventeen count information filed by the state.

The first underlying incident occurred on October 18, 1991. On that date, the defendant and Valentin, using burglar's tools, broke into Rivera's room at the inn. That event was conducted so they could become familiar with the contents of the room; they did not take or disturb anything in the room.

The second underlying incident occurred on October 25, 1991, at approximately 11 a.m. The defendant and Valentin drove to the home of Rivera's brother in New Haven and, under the guise of their police authority, coerced Rivera's sister-in-law, Olga Martinez, to let them conduct a search of her apartment. The two men went to the third floor apartment, retrieved Rivera's safe from the kitchen closet and carried it downstairs to their vehicle. Martinez' neighbor, Miguel Ortiz, observed the two men carry the safe out to their car and drive away.

That same day, Valentin and his mistress, Debra Failla Laughery, drove his state police issued Chevrolet Barretta to the Charter Oak Landing at the Connecticut River. Laughery testified that Valentin made a telephone call to the defendant on the way to the river. In response to that call, the defendant appeared in his vehicle at the river and watched from a distance of approximately thirty feet as Valentin and Laughery wiped down the

safe with a cloth to remove any fingerprints before dumping it into the river. Laughery then saw Valentin walk over to the defendant, converse with him and hand him a pager.

The final underlying incident occurred on November 21, 1991. The defendant and Valentin returned to Rivera's room at the inn. They broke into the room and waited in the bathroom for Rivera to arrive. As Rivera entered the room, the defendant and Valentin grabbed him while shouting, "Police," and assaulted him and robbed him at gunpoint. They bound his hands and feet and blindfolded him with duct tape. They stole a gold chain, a pendant, money and keys from his person. A suitcase containing heroin, money and drug paraphernalia was also taken from the room. Using the keys, they stole Rivera's rented Cadillac. The defendant or Valentin then went to Rivera's self-storage unit in Newington and stole his red Chevrolet Corvette, which contained $48,000.

Valentin and Laughery used the heroin and drug paraphernalia seized from Rivera's hotel room to begin a heroin distribution scheme. Laughery would find a purchaser and then page or call Valentin, who would then meet her at her home in East Hartford to deliver the specified amount of heroin for the customer. When Valentin was unavailable to deliver the heroin to Laughery, the defendant would make the delivery.

I

The defendant first claims that his state and federal constitutional rights[2] to due process were violated when

[2] The defendant makes his claim pursuant to the federal and state constitutions. The defendant, however, failed to provide an independent analysis under the state constitution. Thus, we confine our analysis to a discussion of the defendant's rights under the federal constitution. See *State* v. *Williams*, 81 Conn. App. 1, 18 n.4, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004).

the court instructed the jury on accessorial liability because (1) he was not charged with accessorial liability in any of the long form informations filed by the state and therefore was prejudiced by lack of notice as to the specific crimes with which he was charged[3] and (2) the nature of the evidence did not support a finding of accessorial liability. We disagree.

The following additional facts and procedural history are relevant to our resolution of the claim. The defendant's trial began on May 10, 2001. On June 28, 2001, the state rested its case against the defendant. The defendant did not present any evidence and also rested his case on that date. The state then indicated on the record that it would seek to have instructions given to the jury on accessorial liability. The defendant did not object to being charged as an accessory at that time. On July 5, 2001, the court announced on the record that it would charge the jury on accessorial liability. The defendant again did not object. On July 6, 2001, the state filed its third amended long form information, and the court gave its charge to the jury. Subsequent to the jury charge, the defendant objected on the record, claiming that the instructions on accessorial liability should not have been given because (1) due process provides that the jury cannot be instructed on a theory of liability of which the defendant has not had fair notice, and (2) the charge of accessorial liability was not in conformance with the evidence presented in the state's case-in-chief.

The defendant has presented, for our review on appeal, the same objections to the charge of accessorial liability. His main contention is that because the sixteen substantive charges listed in the substitute information

[3] We note that the defendant has not claimed that the charge as read was improper or misleading to the jury. Instead, he claims that the charge should not have been given at all and, therefore, its reading alone confused and misled the jury.

mentioned only his personal involvement in the criminal conduct described for each offense, as opposed to charging that he and another were responsible for each offense, he was charged only as a principal and not as an accessory.[4] He argues that he filed a motion for a bill of particulars to clarify the nature of the charges against him and that, although the state filed substitute informations, there was never a substantial change in any of the informations filed. In addition, he asserts that the state "reaffirmed" that it was not seeking to try him as an accessory, but solely as a principal, by filing its second amended information without including a charge of accessory. He argues that the prejudice in this case is aggravated because eight years had passed between his arrest and the start of trial and, as a result, he prepared his case around the presumption that he was being tried as a principal only.

At the outset, we note that "[t]he fact that a defendant is not formally charged as an accessory pursuant to General Statutes § 53a-8 does not preclude a conviction as such. . . . This state . . . long ago adopted the rule that there is no practical significance in being labeled an

[4] In support of his argument, the defendant relies on *State* v. *Steve*, 208 Conn. 38, 544 A.2d 1179 (1988). His reliance is misplaced. In *Steve*, the charging documents did not include conspiratorial liability, and the state did not present evidence in its case-in-chief suggesting that the defendant had acted as an accessory. Id., 46. Rather, in *Steve*, it was likely that it was the defendant's testimony that supplied the basis for the jury instruction on accessorial liability. Id. The evidence that precipitated the accessory charge was not revealed until the defense presented its case; the state did not seek the jury instruction on accessorial liability until prior to closing arguments. Id. As such, our Supreme Court held that because the "court's instructions concerning accessorial liability were not in substantial conformity with the allegations in the bill of particulars or the evidence in the state's case-in-chief, [the] instructions were erroneous." Id.

Similarly, in this case, the state requested a jury instruction on accessorial liability prior to closing arguments. In contrast to *Steve*, however, the defendant in this case was charged with conspiracy, and, in addition, the state's case-in-chief included evidence indicative of accessorial liability. Thus, this case is distinguishable from *Steve*, and the defendant's argument fails.

accessory or a principal for the purpose of determining criminal responsibility. . . . Under the modern approach, a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [T]here is no such crime as being an accessory. . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Citations omitted, internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 340–41, 696 A.2d 944 (1997). Moreover, this court has stated that "[t]he propriety of a charge on aiding and abetting is predicated on the basis of the sufficiency of the evidence heard during the course of the trial, not on the mention of such charges in pretrial documents." (Internal quotation marks omitted.) *State* v. *Prat*, 66 Conn. App. 91, 96, 784 A.2d 367 (2001).

Our review of the record reveals that the original as well as the operative long form informations charged the defendant with "conspiracy to commit the crimes alleged in counts one through fourteen of the information." That language alone was sufficient to give the defendant notice that the state could seek a conviction on the ground of accessorial liability. See *State* v. *Correa*, 241 Conn. supra, 344–45 (three conspiracy charges sufficient notice that defendant subject to accessorial liability); *State* v. *Williams*, 220 Conn. 385, 388–90, 599 A.2d 1053 (1991) (language in amended information charging "he or another participant in said crime" sufficient to alert defendant to possibility that state would proceed on alternate theories); *State* v. *Vasquez*, 68 Conn. App. 194, 216–18, 792 A.2d 856 (2002) (nature of state's case should have alerted defendant to likelihood that state could seek conviction on ground of accessorial liability). Moreover, the defendant's supposition that the state "reaffirmed" a decision to try him only as a principal by filing a second information that did

not identify him as an accessory fails in light of the charges of conspiracy and the evidence presented during the state's case-in-chief.

The defendant also claims that the nature of the evidence presented in the state's case-in-chief did not support an accessory theory. He argues that the state "went to great lengths to present the jury with evidence of the defendant's direct, physical involvement in the charged offenses and did not present evidence that he had merely 'assisted' in committing the crimes." He argues further that the evidence did not support the state's claim that he had acted as an accessory, as that term has been interpreted in the past. We disagree.

As we have stated, there is no sharp distinction between principal and accessorial liability. See *State* v. *Harris*, 198 Conn. 158, 164, 502 A.2d 880 (1985). Under our law, both principals and accessories are treated as principals. *State* v. *Vasquez*, supra, 68 Conn. App. 208. It follows that because the defendant directly participated in the substantive offenses, he was, therefore, eligible for conviction under either label. *State* v. *Harris*, supra, 165. Moreover, for us to agree with the defendant's assertion that the state's case-in-chief was targeted solely at a conviction as a principal, we would have to ignore much of the testimony in the record. Because the state sought the defendant's conviction for the alleged offenses, it is axiomatic that it went to great lengths to show the defendant's direct physical involvement in the charged offenses. It is well settled that "[t]o prove guilt as a principal, the state must prove each element of the offense charged beyond a reasonable doubt. To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Fuller*, 58 Conn. App.

567, 574, 754 A.2d 207, cert. denied, 254 Conn. 918, 759 A.2d 1026 (2000). Needless to say, proof of the defendant's involvement in the crimes at issue was essential for a conviction under either principal or accessorial liability.

"Our analysis of [these claims] is guided by the principle that [t]he court . . . has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." (Internal quotation marks omitted.) *State* v. *Wortham*, 80 Conn. App. 635, 649, 836 A.2d 1231 (2003), cert. denied, 268 Conn. 901, 845 A.2d 406 (2004). We thus review all of the evidence adduced at trial in order to discern whether there had been a sufficient basis from which the jury reasonably could conclude that the defendant acted as an accessory. See id. Our review of the record reveals ample testimony from which a jury reasonably could have concluded that the defendant had acted in a manner consistent with accessorial liability in the underlying substantive crimes. Rivera testified concerning the events of November 21, 1991, the night he was robbed by the defendant and Valentin in the hotel room. He stated that when he opened the door to his room, he was grabbed by two men who yelled, "Police." Then, the two men grabbed him and covered his eyes with duct tape, laid him on the floor and tied his legs and hands with the same tape, then used their belts to tie him to a chair.

Martinez and Ortiz testified about the events that occurred on October 25, 1991, when the defendant and Valentin took Rivera's safe from Martinez' apartment. Martinez testified that the two men arrived at her house, showed her some papers through the window and told her to open the door because they were police. She saw two badges. She testified that one man had a radio and stayed in the hall at first and then went up to the apartment. The other man went into the apartment and

searched while she stayed in the hall. She saw them take a box, either a strong box or safe, out of a closet, but was not sure what they did with it because she went downstairs to stay with her neighbor. Ortiz testified that he looked out the window and saw one holding the strong box and the other holding the door open for him. Once outside, one man opened the passenger side door of a two door car. One man put the box in the backseat of the passenger side while the other man went to the driver's side and got into the car. Once the other man got inside, they left.

Laughery testified that sometime prior to October 25, 1991, she accompanied the defendant and Valentin to New Haven to locate the Martinez home because "they wanted to get a safe out of that home that belonged to Rivera." Laughery further testified that Valentin and the defendant would package the heroin together. Finally, Laughery testified that on occasions when Valentin was not available to bring the heroin to her for distribution, the defendant brought it to her. Contrary to the defendant's assertion, therefore, the nature of the state's evidence supported a charge on an accessory theory.

The defendant also contends that because he prepared his defense for eight years under the presumption that he was subject to conviction only as a principal, notice that he would be subject to a charge of accessorial liability after he rested his case was unduly prejudicial. He intimates that he might have presented witnesses, or even testified himself, had he been aware that an accessory charge was a possibility. We disagree.

We have stated that the defendant should have been aware that he was subject to accessorial liability from the charges of conspiracy and the nature of the evidence presented by the state. That said, given our holding in *State* v. *Prat*, supra, 66 Conn. App. 97, the fact that he was given formal notice that an instruction on accesso-

rial liability was imminent after he rested his case is of no consequence. See id. (accessorial liability instruction not improper when defendant had same opportunity as state to prepare final arguments to jury on liability as accessory). Because our review of the record identifies evidence from which the jury reasonably could have found that the defendant was an accessory, we conclude that it was not misleading to the jury for the court to instruct on that theory of liability.[5]

II

The defendant's second claim is that court improperly instructed the jury on conspiracy and thereby violated his due process right under the state and federal constitutions. Specifically, he claims that the court improperly instructed that the jury (1) could find him guilty of conspiracy if it found him guilty of any one of the underlying fourteen substantive offenses and (2) need not find that he had the specific intent necessary to commit the underlying crime. We disagree.

We note that the standard of review for a claim of an improper jury instruction "is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect

---

[5] The defendant also mentioned that the charge of accessorial liability had a negative effect on the jury. He has not claimed that the charge as given was erroneous or misleading; therefore, we need not address the effect on the jury of an erroneous accessory charge. Yet, to the extent that the defendant claims that the jury was not unanimous as to his liability, we note that "in a case involving potential accessory liability, the jury should be regarded as unanimous even if some jurors believed that the defendant was an aider and abetter, while other jurors believed that he was the principal . . . ." (Internal quotation marks omitted.) *State* v. *Flanders*, 214 Conn. 493, 504–505, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990).

upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Wortham,* supra, 80 Conn. App. 643–44.

Additional facts are relevant to our resolution of the claim. In the third long form information, the charge of conspiracy stated: "[T]he undersigned Assistant State's Attorney for the State of Connecticut further accuses [the defendant] of conspiracy to commit the crimes alleged in counts one through fourteen of this information . . . ." On May 8, 2001, prior to the start of evidence, the court inquired as to whether the state wanted to separate that singular conspiracy count into fourteen separate conspiracy counts to ensure the bases for the jury's decision for sentencing purposes. The state suggested that the jury be given a special interrogatory form to provide a clear indication of its findings for each substantive offense in the single conspiracy count. The defendant argued that he had operated under the assumption that a conviction on the conspiracy count could result only if the state proved that he was guilty of all of the alleged substantive offenses. In other words, if the state did not prove that the defendant was guilty of all of the alleged substantive offenses, he must be acquitted of the charge of conspiracy. The court reserved its ruling until the following day.

On May 9, 2001, the defendant argued that pursuant to Practice Book § 36-18, the state may amend the information after the start of trial only for good cause shown and that he would be prejudiced if the state was allowed to amend the information to separate the conspiracy count into multiple counts for each substantive offense.

The court disagreed with the defendant, stating that no additional or different offenses would be charged because, as drafted, the conspiracy count merely charged fourteen separate conspiracy offenses in the conjunctive but that separating each offense from the other was necessary for taking the verdict and sentencing.

In its instructions to the jury, the court stated in relevant part: "[C]onspiracy is a separate crime, separate from the crime alleged in any one or more of the fourteen counts. The state alleges that each of the crimes alleged in the prior counts was the object of a conspiracy entered into by the defendant with one or more other persons . . . and that one or more of them performed overt acts in pursuance of such conspiracy. Thus, you could find a conspiracy to commit any one or more of the crimes alleged in counts one through fourteen provided you are unanimous as to the crime or crimes you find the defendant conspired with others, one or more of them, to commit and, further, provided that you find that all of the elements of the crime of conspiracy have been proven beyond a reasonable doubt. . . .

"The crime of conspiracy consists essentially of an agreement to perform conduct . . . which itself is criminal followed by one or more overt acts in pursuance of that agreement. Section 53a-48 (a) of our statutes provides as follows: 'A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct and any one of them commits an overt act in pursuance of such conspiracy.' "

The court's instructions on the elements of conspiracy included in relevant part: "There are, therefore, three elements to this crime: (1) an intent that criminal

conduct be performed; (2) an agreement with one or more persons to engage in or cause the performance of that conduct; and (3) the commission of an overt act in pursuance of the agreement by any one or more of the persons who made the agreement. . . . The first element is that the defendant had the intent that conduct constituting a crime be performed. The defendant must be proven to have been actuated by criminal intent. It is not necessary, however, that the defendant intended to commit a crime. It is only necessary that he intended that certain conduct which, if performed, would constitute a crime be performed or take place." Prior to commencing its deliberation, the jury was given a special interrogatory and instructed to "check whichever one, one or more [underlying substantive offenses], [it] found to be the object of the conspiracy."

A

The defendant claims that the charge was improper because it expanded the conspiracy charge and substantially decreased the state's burden of proof on that count. He contends that the "disjunctive" instruction enlarged the state's conspiracy allegation from one conspiracy to fourteen separate conspiracies; hence, the state's burden of proof was diluted because it only needed to show conspiracy to commit one underlying offense to achieve a conviction on conspiracy. He further argues that the disjunctive reading of the charge resulted in an improper, de facto amendment of the information. We disagree.

To support his contentions, the defendant cites *State v. Belton*, 190 Conn. 496, 501–502, 461 A.2d 973 (1983), in which our Supreme Court held that the trial court had impermissibly enlarged the offense charged in the state's information by incorporating the uncharged disjunctive phrase "remains unlawfully" when explaining the elements of burglary. The court noted that under

§ 53a-101 (a), a person may be guilty of burglary in the first degree when he *enters or remains* unlawfully in a building and that the state had charged the defendant only with burglary on the theory that he had *entered unlawfully* with the intent to commit a crime therein. It was, therefore, a violation of the defendant's due process rights to use the disjunctive phrase "remains unlawfully" when the state had not charged the defendant with that theory of liability. In this case, the defendant's reliance on *Belton* is misplaced because the charge at issue is distinctly different from that in *Belton*.

Here, the state charged the defendant with the single offense of conspiracy, committed conjunctively in one of fourteen different ways. "Such a method of charging is sanctioned by Practice Book § 618 [now § 36-13] and gives a defendant adequate notice of the offense with which he is charged. . . . A charging document may properly allege, conjunctively, in one count, several statutory methods of committing a single offense. . . . To provide adequate notice to the defendant that the state intends to prove that the offense was committed in one or more alternate ways, a charging document must charge in the conjunctive . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Wohler*, 231 Conn. 411, 414–15, 650 A.2d 168 (1994). This is, therefore, clearly not a case in which the court improperly instructed the jury on a theory of liability that was not included in the information.

The defendant's interpretation of the charge and his arguments on appeal exhibit a misunderstanding of our conspiracy laws. We have stated that "[w]here the evidence establishes only one agreement, there can be only one conspiracy conviction, even though the conspirators planned, as part of the agreement, to engage in conduct violative of more than one criminal statute. . . . Whether the object of a single agreement is to commit one or many crimes, it is in either case that

agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one. . . . The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute. . . . For such a violation, only the single penalty prescribed by the statute can be imposed." (Citations omitted, internal quotation marks omitted.) *State* v. *Toth*, 29 Conn. App. 843, 858–59, 618 A.2d 536, cert. denied, 225 Conn. 908, 621 A.2d 291 (1993). The defendant's argument that pursuant to the court's reading of the information, the state actually charged the defendant with fourteen separate conspiracy allegations within the same count of the information, therefore, fails. He was, as the court aptly stated, charged with one agreement, yet many ways to carry it out. We conclude that the charge was correct and, therefore, that it was not reasonably possible that the jury was misled.

B

The defendant's final claim on appeal is that the court improperly instructed the jury on the elements of conspiracy. Specifically, he contends that the charge was inadequate because the court failed to instruct the jury that it must find that he had the specific intent to violate the law that was the object of the conspiracy. He argues that the charge as given, therefore, amounted to an improper general intent instruction. We disagree.

The defendant has requested *Golding* review of his unpreserved claim. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). His claim is reviewable under *Golding* because the record is adequate for review and involves instructional error regarding the elements of an offense, which is of constitutional magnitude. See *State* v. *Denby*, 235 Conn. 477, 483, 668 A.2d

682 (1995). Accordingly, we review his claim to ascertain whether the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial. See *State* v. *Golding*, supra, 240.

Our examination of the court's instruction regarding the charge of conspiracy reveals that each element of the crime was set forth sufficiently and that it is not reasonably likely that the jury was misled. We agree with the state that the instruction correctly tracked § 53a-48 and comported with our jurisprudence. Moreover, the court thoroughly discussed the elements contained in each of the fourteen substantive underlying offenses, explained that the conspiracy count was a separate charge and instructed the jury that to arrive at a guilty verdict, it must find, beyond a reasonable doubt, that the defendant "intend[ed] that conduct constituting any one or more of the crimes set forth in count one through fourteen of [the] information be performed . . . ." We therefore conclude that the court's instruction on the conspiracy charge as a whole was sufficient to guide the jury in its determination of whether the state had proven each of the specific elements necessary for a conviction of the crime of conspiracy.[6] The

---

[6] We note that the defendant's assertion that the court "actually told the jury that it was not necessary for it to find that the defendant had intended to commit any crime whatsoever when he entered into the conspiracy" is baseless. In its conclusion of the conspiracy instructions, the court stated: "To summarize then, in order for you to convict the defendant on this count, you must be satisfied beyond a reasonable doubt that the following things have been proven: (1) that he had the intent that conduct constituting any one or more of the crimes set forth in count one through fourteen of this information be performed; (2) that acting with that intent, he agreed with one or more persons to engage in that conduct or to cause that conduct to be performed; and (3) that either he or any one of the other parties to the agreement committed an overt act in pursuance of the agreement. Again, to convict the defendant of any conspiracy, you must be satisfied that each and every element of the conspiracy has been proven beyond a reasonable doubt, and you must unanimously agree as to which crime or crimes was the object of any conspiracy." In addition, given the aforementioned instruction, we cannot conclude that the court's charge unconstitutionally relieved the state of its burden of proof on the conspiracy count.

defendant's claim, therefore, fails to satisfy the third prong of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.