STATE OF CONNECTICUT *v.* THEO SARGENT
(AC 23863)

West, McLachlan and Mihalakos, Js.

Argued October 12, 2004—officially released January 18, 2005

*Elizabeth M. Inkster*, senior assistant public defender, with whom were *Christine Plourde* and *Sarah Foster*, certified legal interns, and, on the brief, *Moira L. Buckley*, former assistant public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John P. Doyle, Jr.*, assistant state's attorney, for the appellee (state).

McLACHLAN, J. The defendant, Theo Sargent, appeals from the judgment of conviction, rendered after a jury trial, of one count each of sale of narcotics by a person who is not drug-dependent and sale of narcotics within 1500 feet of a public elementary school in violation of General Statutes §§ 21a-278 (b) and 21a-278a (b), respectively. On appeal, the defendant argues that (1) the court improperly admitted into evidence an undercover police officer's pretrial identification of the defendant, (2) the state committed prosecutorial misconduct during closing argument to the jury, (3) the court improperly instructed the jury by failing to include in its charge the statutory definition of the term "sale" and (4) the court improperly declined to disclose certain confidential employment records of a witness. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In November, 2000, several members of the narcotics enforcement unit of the New Haven police department were assigned to conduct a narcotics sting operation. In connection with the investigation, Officer Rachel Inconiglios was sent to purchase drugs in the area of 87 Kensington Street in New Haven. Inconiglios was working undercover in plain clothes and wearing a body microphone that allowed her to communicate to Detective Burnell A. Burrell and Detective Brian Mauro, backup officers who were monitoring her from a safe distance in unmarked vehicles. Also present was Sergeant Michael Canning, who supervised the operation. Inconiglios drove to 87 Kensington Street in an unmarked vehicle and stopped at an alleyway where a small group of men were gathered. After she got out of her vehicle, one of the men asked "how much" she wanted. She responded "one" and handed the man $20 in bills issued by the police department. She received a small ziplock bag containing a white rock substance

that appeared to be crack cocaine. After the purchase, Inconiglios got back into her vehicle and relayed into the body microphone a brief description of the suspect.

Inconiglios then drove to meet the backup officers at a prearranged location a few blocks away. She repeated to the officers a description of the suspect as a black male, about six feet tall, weighing 200 pounds, wearing a black knit cap, a black jacket, a blue polo shirt and tan moccasins. She testified that she took particular note of the suspect's footwear because in her years of participating in undercover narcotics purchases, she had never seen a suspect wearing moccasins. Canning then relayed that description by cellular telephone to Officer Vincent Anastasio, a uniformed officer who was patrolling the area. Canning instructed Anastasio to drive to 87 Kensington Street and look for someone matching the description provided by Inconiglios. After reaching the location, Anastasio observed four men gathered, three of whom were approximately five feet, seven inches to five feet, eight inches tall and a fourth man who was about six feet, one inch to six feet, two inches tall. From Anastasio's experience patrolling the area and from having had direct contact with the defendant on about six prior occasions, Anastasio was able to recognize the taller man in the group as the defendant. Anastasio also was able to identify by name one of the other men in the group, but did not know the names of the other two men, although he did recognize them. From his vantage point about twenty-five feet away from the group, Anastasio observed that the defendant was the only person wearing moccasins. He testified that in his several years working in the area, he had never seen a suspect wearing moccasins. Anastasio telephoned the backup officers and provided the name of the defendant as the man fitting the description provided by Inconiglios. In the meantime, a field test of the substance purchased from the defendant

revealed that it was cocaine. A full test of the suspected narcotics was later conducted and confirmed that the substance was freebase cocaine.

Burrell compiled a photographic array that included the defendant's photograph and those of seven other men similar in appearance. On December 20, 2000, twenty days after the narcotics transaction at issue, Inconiglios viewed the array and identified the defendant as the person who sold her the drugs. She later made an in-court identification of the defendant. Burrell also compiled a police report of the narcotics transaction. The report, purportedly prepared on December 11, 2000, did not mention Anastasio or his identification of the defendant immediately following the transaction but described Inconiglios' identification of the defendant from the photographic array, which did not occur until December 20, 2000, nine days after the report was prepared.

At trial, the defendant raised alibi and mistaken identity defenses, claiming that on the day in question, he had been at the Roger Everson House (Everson House), a residential facility that houses men on probation or parole. Records introduced at trial showed that the defendant was staying at the Everson House on the day in question and that he did not sign out to leave the facility at any time that day.[1] According to the testimony of one witness, it was possible to exit the facility through windows on the second floor, where the defendant's bedroom was located. A staff member testified that when doing his rounds on the day in question, he thought he saw the defendant in his bed, but did not enter the defendant's room or pull back the bedsheets to confirm the defendant's presence. There was evi-

---

[1] There was evidence, however, that the facility's alarm system was not functioning properly at the time and that during the facility's fourteen years in operation, there were about a dozen known instances of residents missing.

dence that the Everson House is approximately a six minute drive or fifteen minute walk from 87 Kensington Street.

Following a trial, the jury found the defendant guilty of both charges, and the court sentenced him to nine years incarceration for the sale of narcotics and three years incarceration for the sale of narcotics within 1500 feet of a public elementary school, to run consecutively, for a total effective sentence of twelve years incarceration.[2] The defendant now appeals.

I

The defendant first claims that the court improperly admitted into evidence Inconiglios' pretrial identification of him from the photographic array. He claims specifically that the photographic array procedure was unnecessarily suggestive and unreliable, and that it thereby deprived him of the right to a fair trial pursuant to the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut. We decline to review his claim.

Five days before the start of evidence, the defendant filed a motion to suppress Inconiglios' identification. The defendant did not pursue a hearing on the motion and one was never held. The defendant also did not object at trial to the admission of Inconiglios' testimony regarding the photographic array. The defendant nevertheless seeks review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In his brief, the defendant asserts that "[t]he trial court made no findings of fact on the issue of identification, as there was no challenge at trial." The defendant argues that in the absence of factual findings, this court should examine the entire record and make an independent

---

[2] The narcotics transaction occurred within 395 feet of the Timothy Dwight School, a public elementary school.

determination of the propriety of the identification procedures at issue.

It is well settled that it is the duty of the appellant to provide this court with an adequate record to review his claims. See Practice Book §§ 60-5 and 61-10. Accordingly, "[a] lack of pertinent factual findings and legal conclusions will render a record inadequate." (Internal quotation marks omitted.) *State* v. *Gasser*, 74 Conn. App. 527, 535, 812 A.2d 188, cert. denied, 262 Conn. 954, 818 A.2d 781, cert. denied, 540 U.S. 823, 124 S. Ct. 153, 157 L. Ed. 2d 43 (2003).

Our review of the record reveals that the court did not articulate any factual findings or legal conclusions regarding the propriety of the photographic array procedure or Inconiglios' identification testimony. Defense counsel failed either to interpose an objection to the testimony or to renew her motion to suppress the testimony, either of which actions would have elicited from the court the necessary factual findings.

"This court's role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *State* v. *Salerno*, 36 Conn. App. 161, 166, 649 A.2d 801 (1994), appeal dismissed, 235 Conn. 405, 666 A.2d 821 (1995). "When our rules of practice are not followed, and the record is not rectified, we are left to guess or speculate as to the existence of a factual predicate." (Internal quotation marks omitted.) Id. As it is not the function of this court to find facts when the record is devoid of such findings, we decline to review the defendant's claim.

II

The defendant next claims that the state committed prosecutorial misconduct in closing argument. The defendant argues that those instances of alleged mis-

conduct deprived him of the right to a fair trial pursuant to the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut.[3] We disagree.[4]

Conceding that several of the instances of claimed misconduct are unpreserved, the defendant seeks review under *State* v. *Golding,* supra, 213 Conn. 239–40. Our Supreme Court recently clarified its due process analysis in cases involving incidents of alleged prosecutorial misconduct that were not objected to at trial. In *State* v. *Stevenson,* 269 Conn. 563, 575, 849 A.2d 626 (2004), the court held that "following a determination that prosecutorial misconduct has occurred, regardless of whether it was objected to, an appellate court must apply the [factors set forth in *State* v. *Williams,* 204 Conn. 523, 540, 529 A.2d 653 (1987)] to the entire trial."[5] As a result, we review the defendant's claim despite the fact that some of the alleged instances of misconduct were not objected to at trial.

"In analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct

---

[3] In light of the defendant's failure to provide an independent analysis under the state constitution, we confine our analysis to a discussion of the defendant's rights under the federal constitution. See *State* v. *Morales,* 84 Conn. App. 283, 288 n.2, 853 A.2d 532, cert. denied, 271 Conn. 928, 859 A.2d 584 (2004).

[4] The defendant requests, in the alternative, that this court exercise its supervisory power to reverse the judgment of conviction. "Our supervisory powers . . . are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hines,* 243 Conn. 796, 815, 709 A.2d 522 (1998).

[5] The *Williams* factors are: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case. *State* v. *Williams,* supra, 204 Conn. 540.

occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial, an inquiry that in the present case necessarily will require evaluation of the defendant's other misconduct claims." (Internal quotation marks omitted.) *State* v. *Jarrett*, 82 Conn. App. 489, 501–502, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

In accordance with those principles, we first analyze the remarks at issue to determine if they were improper and rose to the level of prosecutorial misconduct. If they did, we shall analyze the remarks to determine if they deprived the defendant of a fair trial.

A

The first remark at issue was made by the prosecutor in an attempt to explain why twenty days elapsed between the date of the narcotics transaction and the date Inconiglios was shown the photographic array. Defense counsel had raised the lapse of time to argue the unreliability of Inconiglios' identification. Counsel stated that "[t]here was no good reason given to you why that photo[graph] board wasn't produced earlier." The prosecutor remarked: "We are not talking about five jobs here that police officers have; police officers work twenty-four hours a day, seven days a week. They work different shifts, they work different hours. As soon as [Detective Burrell] could get to Officer Inconiglios, he had her view this photo[graph] board and sign something [on the] day that she viewed this photo[graph] board."

Following jury instructions, the defendant objected
to the remark on the ground that there was no evidence
in the record that police work in shifts or work twenty-
four hours a day, seven days a week. The court noted
the objection for the record, but sent the jury to deliber-
ate. The next day, defense counsel made an oral motion
for a mistrial on the ground of prosecutorial miscon-
duct, claiming, inter alia, that there was no evidence
regarding the working hours or schedules of police
officers. The state countered that police working hours
are common knowledge and that the remarks were
logical inferences from testimony. The court denied the
motion for a mistrial, but reinstructed the jury regarding
what properly constitutes evidence.[6]

Our review of the record reveals that there was direct
testimony regarding the working hours of police offi-
cers and that the prosecutor's statement amounted to
a reasonable inference from that testimony. Canning
testified that officers assigned to a statewide narcotics
task force work "more of a twenty-four hour a day,
seven, eight days a week . . . whereas in New Haven,
we are Monday through Friday, so to speak, eight hour
day to forty-four hours a week." Although there was no
testimony regarding Inconiglios' precise working hours
during the period of time at issue, she did testify in
relevant part that in the months surrounding November
30, 2000, she "worked for the New Haven police narcot-

---

[6] The court instructed the jury in relevant part: "I am going to reinstruct
you on something that I told you at the beginning of the trial . . . . Evidence
consists solely of the testimony of witnesses, documents and other materials
received into evidence as exhibits and any facts on which the lawyers agreed
or that I instructed you to accept. Evidence is, therefore, limited to, one,
the witnesses' testimony, two, exhibits, which you have with you in the jury
room, and three, stipulations by the lawyers or facts which I have instructed
you to accept. The following is or are not evidence, and you must not
consider them as evidence in deciding the facts of this case: One, statements
and arguments by the attorneys are not evidence; objections by the attorneys
are not evidence; and testimony that I have told you to disregard is not
evidence."

ics unit for approximately three months as an undercover officer, then . . . was assigned to a statewide narcotics unit for approximately eight months." She testified that both assignments involved undercover work.

Our decisional law on prosecutorial misconduct makes clear that, as the state's advocate, a prosecutor may comment on the evidence adduced at trial and argue inferences that the jurors might draw therefrom. See, e.g., *State* v. *Perkins*, 271 Conn. 218, 268, 856 A.2d 917 (2004). In the present case, the prosecutor's remark amounted to a reasonable inference from the testimony adduced at trial. We accordingly conclude that the remark did not constitute misconduct.

B

The defendant also challenges the following remark made by the prosecutor: "One of the things, as an attorney, I would love to come in here and have the whole thing on tape, the individuals each on tape, absolutely. I would love to have [the defendant] have handed Officer Inconiglios a business card that [he] was a crack dealer with a bag of crack, absolutely, but that's not the way things work out on the street. That's not the way they work." The defendant argues that the prosecutor improperly characterized the defendant as a "crack dealer," and thereby expressed his personal opinion that the defendant was guilty and appealed to the jurors' prejudices and emotions.

It has been emphasized that prosecutors should be accorded latitude in their argument and "should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Perkins*, supra, 271 Conn. 268.

Our review of the record reveals that the comment was not expressed as a statement of personal opinion about the defendant, but was merely a rhetorical device used to counter the jury's potential unrealistic expectations regarding the availability of certain evidence. We accordingly conclude that the statement did not amount to misconduct.

C

The third remark at issue pertained to the identification testimony of Inconiglios and Anastasio. The prosecutor stated in relevant part: "[Y]ou have two individuals putting [the defendant] over there on Kensington Street, you have two individuals indicating he's the one who sold the bag of crack cocaine to the undercover police officer and, remember, we are not talking about a regular person on the street. . . . We are talking about people who were trained to do this. This is their job. Officer Inconiglios told you all the schools that she went to, all the training that she has and all the experience that she had. So, when [she] walked up to this guy right here and bought crack from him, looked him right in the face and walked away, walked back and gave a description of what he looked like, then picked him out a couple weeks later . . . we are talking about police officers who are trained to do this. This is their job." The defendant argues that those comments influenced the jury to hold the testimony of Inconiglios and Anastasio in higher regard in terms of reliability because they are police officers. The defendant claims that in so doing, the prosecutor effectively vouched for their credibility.

"The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult

for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002).

It is permissible, however, for the prosecutor to "argue to the jury that the evidence and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses. . . . It is not improper for a prosecutor to comment on the credibility of a witness as long as he neither personally guarantees the witness' credibility nor implies that he has knowledge of the witness' credibility outside the record." (Citation omitted; internal quotation marks omitted.) *State* v. *Jeudis*, 62 Conn. App. 787, 794, 772 A.2d 715, cert. denied, 256 Conn. 923, 774 A.2d 140 (2001).

At least with respect to Inconiglios, there was testimony at trial as to the specialized training police officers receive and that this training makes them particularly qualified to identify suspects. During cross-examination, defense counsel twice questioned Inconiglios as to whether she was a "trained observer," and both times she affirmed that she was. When asked what specific training she had received in making observations, Inconiglios testified that she was taught to be observant "in all of the classes, including the police academy." She also indicated that she was knowledgeable of the various factors that may influence the reliability of an identification.

In the present case, the prosecutor did not vouch personally for the truth and veracity of the state's witnesses. The remarks in question did not amount to any subjective opinion of credibility, but simply reiterated

the qualifications elicited from Inconiglios on cross-examination. Also, the court's instructions ensured that the jury would evaluate the officers' credibility in the same way and by the same standards as any other witness and would not accord the officers special weight because of their status.[7] We therefore conclude that the prosecutor's comments were not improper.

### D

The fourth remark at issue occurred during the prosecutor's examination of Detective Burrell:

"[The Prosecutor]: Do you know what is present at [7 Baldwin Street, the location of Everson House]?

"[The Witness]: I believe it's a halfway house for criminals, I guess.

"[Defense Counsel]: Objection, Your Honor.

"[The Prosecutor]: Withdrawn. . . . It's a halfway house for criminals?

"[Defense Counsel]: I objected, Your Honor.

"The Court: I am going to instruct the jury that [it is] to strike that testimony of, 'for criminals.' There has already been testimony as to what is at Baldwin Street, and that is the testimony that should be considered."

The defendant argues that the prosecutor's repetition of Burrell's comment expressed the prosecutor's personal opinion that the defendant was a "criminal" and appealed to the jurors' prejudices and emotions.

---

[7] The court instructed the jury: "Police officers have testified in this case. You must determine the credibility of police officers in the same way and by the same standards as you would evaluate the testimony of any ordinary witness. The testimony of a police official is entitled to no special or exclusive weight merely because it comes from a police official. You should recall his demeanor on the [witness] stand, his manner of testifying, and weigh and balance it just as carefully as you would the testimony of any other witness."

"It is well settled that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Tate*, 85 Conn. App. 365, 372–73, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). "Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) Id., 373.

Our review of the record persuades us that the remark at issue did not amount to misconduct. There was testimony by several witnesses, including defense witnesses, that the Everson House was a residence for men on probation and parole.[8] The prosecutor's question simply restated that evidence, which already was in the record as to the nature of the facility. Also, the prosecutor's comment was not couched in language suggesting that he was expressing his personal opinion, but rather was phrased in a manner that conveyed that he was simply restating for clarification Burrell's testimony. We accordingly conclude that the comment was not improper. Furthermore, any harm that may have resulted from the remark was ameliorated by the court's immediate instruction to strike the words "for crimi-

---

[8] There was testimony by defense witness John Massari, director of residential services at the Everson House, that the facility was funded by court support services for men on probation or parole who are sent there directly from the court.

nals" and to consider only the evidence already admitted as to the nature of the facility.

## E

The final remark at issue was made by the prosecutor in an attempt to explain why Burrell's police report documenting the narcotics transaction indicated that it was prepared on December 11, 2000, yet referenced Inconiglios' December 20, 2000 identification of the defendant from the photographic array. The prosecutor stated: "Now, Detective Burrell, in regard to the police report, he indicated to you that's when he started writing his police report and he's going to finish up when the incident happened, and the day that he's writing the report is the day that he started, it's not the day that he finished the report." Defense counsel objected to that remark, which objection was overruled.

During deliberations, the jury sent a note to the court, asking: "Will we be able to get any information as to whether the police report was started or finished on December 11? Can we consider this as evidence?" As the note was sent late in the afternoon, the court postponed answering the question until the following morning. The following morning, defense counsel made an oral motion for a mistrial on the ground of prosecutorial misconduct based in part on the claim that there was no evidence that Burrell merely began his report on December 11, 2000. The court denied the motion for a mistrial, but, as previously discussed, reinstructed the jury that the evidence it should consider consisted solely of testimony, exhibits and stipulations, not arguments and objections of counsel. The jury returned to deliberating and had no further questions before returning its verdict.

The defendant argues that the prosecutor's reference to the report merely being started by Burrell on December 11, 2000, did not accurately reflect the testimony

adduced at trial and, therefore, was improper because the prosecutor argued facts that were not in evidence. In its brief, the state concedes that the prosecutor's remark "was not an accurate summary of Burrell's testimony," but urges us to conclude that it was nevertheless proper because it merely reflected a reasonable inference that could have been drawn from the evidence.

According due regard to the principles previously enunciated regarding the latitude generally afforded to prosecutors, we conclude that the remark at issue was improper. We reach that conclusion primarily on the basis of the prosecutor's use of the prefatory phrase, "[Burrell] indicated to you," which conveyed to the jury that he was recounting Burrell's actual testimony, rather than drawing inferences therefrom. In making that remark, the prosecutor mischaracterized Burrell's testimony and committed misconduct.

We turn now to the matter of determining whether the misconduct was so severe as to deny the defendant his right to a fair trial. "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Jarrett*, supra, 82 Conn. App. 501. As stated previously, we make that determination by examining several factors, including (1) the extent to which the misconduct was invited by defense conduct or argument, (2) the severity of the misconduct, (3) the frequency of the misconduct, (4) the centrality of the misconduct to the critical issues in the case, (5) the strength of the curative measures adopted and (6) the strength of the state's case. See *State* v. *Williams*, supra, 204 Conn. 540.

After reviewing the record, we conclude that it is highly unlikely that the remark had any effect on the jury's deliberations. Much of the state's argument focused on the second, fourth and fifth *Williams* factors, and it is those that are particularly significant to our determination.

Our analysis reveals that the prosecutorial misconduct in the present case was not severe in nature. The remark, while not an accurate representation of the witness' testimony, was neither inflammatory nor prejudicial. Furthermore, the substance of the remark was not central to the critical issue in the case. Although the report did reference Inconiglios' identification of the defendant, a critical issue in the case, the actual date of the report, and any dispute related thereto, did nothing to impugn the accuracy of the identification testimony of Inconiglios and Anastasio. Finally, we conclude that any possible harm to the defendant from the misconduct was obviated by the court's instruction to the jury. The court initially instructed and later reminded the jury that "[e]vidence consists solely of the testimony of witnesses, documents and other materials received into evidence . . . and you must not consider . . . as evidence . . . statements and arguments by the attorneys . . . ." "[I]n the absence of an indication to the contrary, the jury is presumed to have followed [the court's] curative instructions." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 413, 832 A.2d 14 (2003). We accordingly conclude that the defendant was not deprived of the right to a fair trial.[9]

---

[9] We similarly deny the defendant's request that we utilize our supervisory powers to reverse the judgment of conviction. The defendant has not demonstrated, nor does the record disclose, "a pattern of misconduct across trials" that would lead us to invoke our supervisory powers to reverse the judgment. See *State* v. *Saez*, 76 Conn. App. 502, 509, 819 A.2d 927 (declining to exercise supervisory powers because requisite pattern of misconduct not present), cert. denied, 264 Conn. 914, 826 A.2d 1158 (2003).

## III

The defendant next claims that the court improperly failed to instruct the jury on the statutory definition of the word "sale," as it is used in §§ 21a-278 (b) and 21a-278a (b). The defendant argues specifically that in the absence of such an instruction, the jury could have applied the common definition of "sale," which does not precisely track the statutory definition, thereby depriving the defendant of due process pursuant to the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut.[10] We disagree.

Conceding that he failed to raise an exception to that portion of the jury charge at trial, the defendant now seeks review under *State* v. *Golding,* supra, 213 Conn. 239–40. We review his claim under *Golding* because the claim is of constitutional magnitude and because the record is adequate for review. See *State* v. *Denby,* 235 Conn. 477, 483–84, 668 A.2d 682 (1995).

The court instructed the jury in relevant part as follows: "As to . . . § 21a-278 (b), the applicable part of the statute holds that a person is guilty of sale of a narcotic substance when a person sells to another person a narcotic substance. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: One, you must find that the defendant knowingly sold to another person a narcotic substance . . . . As to . . . § 21a-278a (b) . . . [t]he applicable part of this statute holds that a person is guilty . . . when a person sells to another person a controlled substance within 1500 feet of . . . a public elementary school. For you to find the defendant guilty of this charge, the state must prove the

---

[10] Again, because the defendant failed to brief his state constitutional claim separately, we consider only his federal constitutional claim. See footnote 3.

following elements beyond a reasonable doubt: One, that the defendant knowingly sold to another person; two, a controlled substance." The court did not instruct the jury on the particular statutory definition relevant to the crimes charged.

General Statutes § 21a-278 (b) imposes penalties on "[a]ny person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance . . . ." That provision is incorporated by reference into § 21a-278a (b), which provides specific guidelines for penalties for selling narcotics within 1500 feet of certain structures, including public elementary schools. General Statutes § 21a-240, the definition section applicable to the chapter, defines the term "sale" as "any form of delivery which includes barter, exchange or gift, or offer therefor, and each such transaction made by any person whether as principal, proprietor, agent, servant or employee . . . ." General Statutes § 21a-240 (50).

Merriam-Webster's Collegiate Dictionary (10th Ed. 1999) offers the following definitions of "sale": "1: the act of selling . . . the transfer of ownership of and title to property from one person to another for a price 2a: opportunity of selling or being sold . . . b: distribution by selling 3: public disposal to the highest bidder . . . 4: a selling of goods at bargain prices . . . ." "Although it is generally preferable for a jury to be instructed on the statutory definition of a word where one exists, a trial court is not necessarily required to do so. . . . Specific words in a statute need not be defined if they are being used and understood in their ordinary meaning." (Citation omitted.) *State* v. *Brown*, 259 Conn. 799, 808, 792 A.2d 86 (2002). "If the statutory and dictionary definitions are sufficiently similar, the need for the jury to be read the statutory definition is less compelling."

*State* v. *Spillane*, 255 Conn. 746, 755, 770 A.2d 898 (2001).

Although the statutory definition of the term "sale" is substantially broader in scope than the common dictionary definition and, therefore, not "sufficiently similar," we conclude that the term was being used, in this specific instance, in its ordinary meaning.[11] The transaction underlying the crimes charged was a simple hand-to-hand sale of narcotics for money, the specifics of which were testified about by Inconiglios.[12] In explaining that it is not always necessary for the court to provide a statutory definition of a word, our Supreme Court has stated that terms "should [be] defined by the court if in relation to the evidence they were used in anything other than their ordinary meaning." *State* v. *Maresca*, 173 Conn. 450, 460, 377 A.2d 1330 (1977).

As the sale at issue accords with the common definition, a further instruction on the various other types of transactions that may constitute a sale was not necessary, and the court's failure to give such an instruction was not improper. The defendant's claim, therefore, fails under the third prong of *Golding* because he has failed to demonstrate that the alleged constitutional violation clearly exists and clearly deprived him of a fair trial.

IV

The defendant claims finally that the court improperly determined that certain personnel records of a

---

[11] This court has observed that the statutory definition of "sale" as applied to illegal drug transactions is much broader than its common definition. See *State* v. *Arbelo*, 37 Conn. App. 156, 159–60, 655 A.2d 263 (1995).

[12] We note also that the "sale" element of the crimes charged was not seriously contested at trial by the defendant. The theory of defense was, in essence, that the defendant was mistakenly identified as the individual who participated in the narcotics transaction. Defense counsel did not contest that a narcotics transaction occurred.

police officer witness should not be disclosed at trial. We disagree.

The defendant subpoenaed Canning's confidential personnel files on the basis of a good faith belief that he had been disciplined at some point in his tenure with the police department. The defendant requested that the court view the records in camera to determine whether they contained any impeachment material. The city of New Haven filed a motion to quash the subpoena. The court denied that motion and conducted an in camera review of the sealed files. Before the start of evidence, the court explained that it had conducted an in camera review of the files and would not disclose their contents because they contained "absolutely no issues regarding the potential witness' credibility or veracity." The court then had the files marked as court exhibits and sealed for appellate review.

"With respect to a trial court's consideration of whether to allow a defendant access to requested confidential materials, we have held that, upon a proper showing and after an in camera review, [a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records. . . . When a defendant seeks access to confidential records for impeachment purposes, the trial court must determine whether [the records] sufficiently disclose material especially probative of the [witness'] ability to comprehend, know, and correctly relate the truth . . . . Moreover, we have held that [t]he determination of materiality . . . [is] inevitably fact-bound and like other factual issues is committed to the trial court in the first instance." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 403, 844 A.2d 810 (2004).

After a careful review of the records at issue, we conclude that they do not contain impeachment evidence or evidence relating to Canning's ability "to comprehend, know, and correctly relate the truth . . . ." (Internal quotation marks omitted.) Id. Accordingly, we conclude that the court did not abuse its discretion in denying the defendant access to the records.

The judgment is affirmed.

In this opinion the other judges concurred.

