THEO SARGENT *v.* COMMISSIONER OF
CORRECTION
(AC 30385)

Bishop, DiPentima and Peters, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued March 10—officially released June 15, 2010

*Kalisha R. Raphael*, assistant public defender, for the appellant (petitioner).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Linda N. Howe*, former senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, Theo Sargent, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the

petitioner claims that the court improperly (1) denied his claim of actual innocence, (2) denied his claim of ineffective assistance of counsel and (3) failed to admit relevant evidence. We affirm the judgment of the habeas court.

This court previously set forth the underlying facts of this case in *State* v. *Sargent*, 87 Conn. App. 24, 864 A.2d 20, cert. denied, 273 Conn. 912, 870 A.2d 1082 (2005), and they were recited by the habeas court. "In November, 2000, several members of the narcotics enforcement unit of the New Haven police department were assigned to conduct a narcotics sting operation. In connection with the investigation, Officer Rachel Inconiglios[1] was sent to purchase drugs in the area of 87 Kensington Street in New Haven. Inconiglios was working undercover in plain clothes and wearing a body microphone that allowed her to communicate to Detective Burnell A. Burrell and Detective Brian Mauro, backup officers who were monitoring her from a safe distance in unmarked vehicles. Also present was Sergeant Michael Canning, who supervised the operation. Inconiglios drove to 87 Kensington Street in an unmarked vehicle and stopped at an alleyway where a small group of men were gathered. After she got out of her vehicle, one of the men asked 'how much' she wanted. She responded 'one' and handed the man $20 in bills issued by the police department. She received a small ziplock bag containing a white rock substance that appeared to be crack cocaine. After the purchase, Inconiglios got back into her vehicle and relayed into the body microphone a brief description of the suspect.

"Inconiglios then drove to meet the backup officers at a prearranged location a few blocks away. She

---

[1] Inconiglios' name and rank have changed since the relevant events in November, 2000, and she is now Sergeant Rachel Ross. For clarity, and intending no disrespect to Sergeant Ross, we will refer to her as her name and rank were in 2000.

repeated to the officers a description of the suspect as a black male, about six feet tall, weighing 200 pounds, wearing a black knit cap, a black jacket, a blue polo shirt and tan moccasins. She testified that she took particular note of the suspect's footwear because in her years of participating in undercover narcotics purchases, she had never seen a suspect wearing moccasins. Canning then relayed that description by cellular telephone to Officer Vincent Anastasio, a uniformed officer who was patrolling the area. Canning instructed Anastasio to drive to 87 Kensington Street and look for someone matching the description provided by Inconiglios. After reaching the location, Anastasio observed four men gathered, three of whom were approximately five feet, seven inches to five feet, eight inches tall and a fourth man who was about six feet, one inch to six feet, two inches tall. From Anastasio's experience patrolling the area and from having had direct contact with the [petitioner] on about six prior occasions, Anastasio was able to recognize the taller man in the group as the [petitioner]. Anastasio also was able to identify by name one of the other men in the group, but did not know the names of the other two men, although he did recognize them. From his vantage point about twenty-five feet away from the group, Anastasio observed that the [petitioner] was the only person wearing moccasins. He testified that in his several years working in the area, he had never seen a suspect wearing moccasins. Anastasio telephoned the backup officers and provided the name of the [petitioner] as the man fitting the description provided by Inconiglios. In the meantime, a field test of the substance purchased from the [petitioner] revealed that it was cocaine. A full test of the suspected narcotics was later conducted and confirmed that the substance was freebase cocaine.

"Burrell compiled a photographic array that included the [petitioner's] photograph and those of seven other

men similar in appearance. On December 20, 2000, twenty days after the narcotics transaction at issue, Inconiglios viewed the array and identified the [petitioner] as the person who sold her the drugs. She later made an in-court identification of the [petitioner]. Burrell also compiled a police report of the narcotics transaction. The report, purportedly prepared on December 11, 2000, did not mention Anastasio or his identification of the [petitioner] immediately following the transaction but described Inconiglios' identification of the [petitioner] from the photographic array, which did not occur until December 20, 2000, nine days after the report was prepared.

"At trial, the [petitioner] raised alibi and mistaken identity defenses, claiming that on the day in question, he had been at the Roger Everson House (Everson House), a residential facility that houses men on probation or parole. Records introduced at trial showed that the [petitioner] was staying at the Everson House on the day in question and that he did not sign out to leave the facility at any time that day.[2] According to the testimony of one witness, it was possible to exit the facility through windows on the second floor, where the [petitioner's] bedroom was located. A staff member testified that when doing his rounds on the day in question, he thought he saw the [petitioner] in his bed, but did not enter the [petitioner's] room or pull back the bedsheets to confirm the [petitioner's] presence. There was evidence that the Everson House is approximately a six minute drive or fifteen minute walk from 87 Kensington Street." Id., 26–29.

Following a criminal trial, the jury found the petitioner guilty of sale of narcotics by a person who is not

---

[2] "There was evidence, however, that the facility's alarm system was not functioning properly at the time and that during the facility's fourteen years in operation, there were about a dozen known instances of residents missing." State v. Sargent, supra, 87 Conn. App. 28 n.1.

drug-dependent in violation of General Statutes § 21a-278 (b) and sale of narcotics within 1500 feet of a public elementary school in violation of General Statutes § 21a-278a (b). The court sentenced the petitioner to nine years incarceration for the sale of narcotics and three years incarceration for the sale of narcotics within 1500 feet of a public elementary school, to run consecutively, for a total effective sentence of twelve years incarceration. The petitioner appealed from his conviction to this court, and we affirmed the judgment of the trial court. Id., 26. Our Supreme Court denied certification to appeal. The petitioner next brought a petition for a writ of habeas corpus, claiming that he was deprived of his right to the effective assistance of trial counsel and that he was actually innocent. The habeas court denied the petition, and this appeal followed. Additional facts will be set forth as necessary.

I

The petitioner first claims that the habeas court improperly found that he had failed to prove that he was actually innocent of the charges of which he was convicted. Specifically, the petitioner argues that the court incorrectly applied the legal test for claims of actual innocence by failing to consider (1) whether he established by clear and convincing evidence, taking into account both the evidence at the habeas trial and the criminal trial, that he was actually innocent, and (2) whether a reasonable fact finder would find the petitioner guilty after considering all of the evidence from the habeas trial and the criminal trial and the reasonable inferences to be drawn from such evidence. We disagree.

The following factual and procedural history is relevant to our resolution of the petitioner's claim. At the habeas trial, the petitioner alleged that his brother, Ernest Sargent, actually committed the sale of narcotics

to Inconiglios on November 30, 2000, in the area of 87 Kensington Street in New Haven. The petitioner claimed that he did not know that his brother was on Kensington Street on that date and that it had never crossed his mind that he would have been there. The petitioner testified that he did not find out that his brother had been selling drugs on Kensington Street on that specific date until 2008. The petitioner claimed that he knew his brother would sometimes hang around in the area of Kensington and Garden Streets (Garden is located one street away from Kensington, and was the street where the petitioner lived with his mother and father). The petitioner also testified that the police had confused him with his brother on a prior occasion, but it never crossed his mind following his arrest, or when preparing for trial, that the police might have mistaken him for his brother in this instance. He testified that none of the multiple family members who lived in the area ever mentioned that it might have been his brother who the police had observed, even though they were aware that his brother had prior convictions for the sale of narcotics. The petitioner further stated that in the eight years following his conviction, he never considered that it might have been his brother. And the petitioner claimed that he had never seen his brother wearing tan or beige loafers or moccasins.

Ernest Sargent testified at the habeas hearing that he sold drugs, that he had four prior convictions for drug offenses, all of which originated in the area of Kensington Street, and that on the date in question, he was selling drugs in front of 87 Kensington Street. He testified that there were three or four other people present with him on that date, but the petitioner was not one of them. He further testified that 87 Kensington Street was the address where his grandmother lived and that he would sell drugs from that location every morning after returning from his job as a laborer in a

warehouse, where he worked an 11:30 p.m. to 7 a.m. shift. He stated that he could not remember what he was wearing on that date but claimed to have owned a pair of tan and beige "Clarks" brand loafers that he often wore during that time period. He also testified that he looked like the petitioner, wore facial hair in a manner similar to the petitioner and had been mistaken for the petitioner in the past. He stated that he was aware that the petitioner had been arrested but did not come forward because he feared being prosecuted himself. It was not until eight years later, after being informed by the public defender's office that the statute of limitations had expired on his prior drug sales, that he believed he could safely come forward.

On cross-examination, Ernest Sargent testified that he had a clean-shaven head on the date of the narcotics sale, that he lived on Fowler Street, which was fifteen minutes from Kensington Street, and that although he was often hot and tired after working the 11:30 p.m. to 7 a.m. shift in a warehouse, he would still sell drugs every morning in front of his grandmother's residence after he had finished working. He conceded that his three convictions for the sale of narcotics came in the early 1990s and, except for a 1999 conviction for possession of marijuana, he had not been in trouble in recent years. He testified that he no longer had the tan loafers because he had thrown them out, but he said that the petitioner had seen him wearing those shoes in the past. He claimed that from 2002, when the petitioner was convicted, until 2008, when he came forward, he had felt badly that his brother was in jail but never said anything in his defense because he was afraid of going to jail. In response to questions from the court, Ernest Sargent stated that he knew the petitioner had been charged with selling narcotics on November 30, 2000, at the same location where Ernest Sargent claimed to sell drugs each morning. He acknowledged that he

attended the petitioner's trial, but it never crossed his mind that he might have been the one whom the police observed conducting this particular drug transaction.

In its memorandum of decision, the court stated its conclusion that Ernest Sargent's testimony could not be termed " 'newly discovered evidence' " because it was information that could have been available to the petitioner at the time of trial with even a minimal amount of effort. The court noted that it could not accept the petitioner's testimony that it never crossed his mind that his brother might have committed the crime, despite the fact that people had confused the two brothers in the past and that Ernest Sargent had sold drugs on a daily basis at the time and place where the undercover buy took place. Although the court found that Ernest Sargent bore a strong resemblance to the petitioner and credited his testimony that he was, in fact, a drug dealer in the Kensington Street area at the relevant time, the court found Ernest Sargent's testimony to be contrived. Accordingly, the court did not credit his testimony that it was he, and not the petitioner, who had committed the sale of narcotics to Inconiglios. The court specifically discussed the difficulty it found in believing that Ernest Sargent sat by and said nothing while his brother was convicted and sentenced to a twelve year prison term for a crime he allegedly did not commit. The court further noted that it credited Inconiglios' testimony regarding her identification of the petitioner in 2000 that she would not have made an identification from the photographic array if she were not 100 percent certain. The court also credited the testimony of Anastasio, who was familiar with the petitioner from the neighborhood and recognized him at the location of the sale of narcotics, rejecting the possibility that Ernest Sargent was the person that he had seen at the crime scene. Last, the court found that although the petitioner had a plausible alibi, which

was that he was confined to Everson House at the time of the crime, the jury had rejected it. Quoting *Johnson* v. *Commissioner of Correction*, 101 Conn. App. 465, 470, 922 A.2d 221 (2007), the court concluded that the petitioner had "failed to establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he [was] actually innocent of the crime of which he stands convicted." (Internal quotation marks omitted.)

The petitioner's two arguments relating to his claim of actual innocence correspond with the two prongs of the standard for actual innocence claims, as was set forth in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747, 700 A.2d 1108 (1997). "In *Miller* . . . this court held that the proper standard for evaluating a freestanding claim of actual innocence . . . is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty of the crime." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 80–81, 967 A.2d 41 (2009).

Additionally, our Supreme Court has deemed the issue of whether a habeas petitioner must support his claim of actual innocence with newly discovered evidence an open question in our habeas jurisprudence. *Clarke* v. *Commissioner of Correction*, 249 Conn. 350, 358, 732 A.2d 754 (1999). This court, nevertheless, has held that a claim of actual innocence must be based

on newly discovered evidence. In *Weinberg* v. *Commissioner of Correction*, 112 Conn. App. 100, 119, 962 A.2d 155, cert. denied, 291 Conn. 904, 967 A.2d 1221 (2009), we stated: "[A] writ of habeas corpus cannot issue unless the petitioner first demonstrates that the evidence put forth in support of his claim of actual innocence is newly discovered. . . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) Because the habeas court in this instance found, based on both the trial and habeas court evidence, that the petitioner had not proven his actual innocence claim by clear and convincing evidence, we need not revisit the answer this court gave in *Weinstein* to the Supreme Court's unanswered question regarding the need to present newly discovered evidence in support of an actual innocence claim in a habeas proceeding.

"With respect to the first component of the petitioner's burden, namely, the factual finding of actual innocence by clear and convincing evidence . . . [t]he appropriate scope of review is whether, after an independent and scrupulous examination of the entire record, we are convinced that the finding of the habeas court that the petitioner is [not] actually innocent is supported by substantial evidence." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803.

The record belies the petitioner's allegation that the court failed to consider whether the petitioner established by clear and convincing evidence, taking into account both the evidence at the habeas trial and the criminal trial, that he was actually innocent. The court's memorandum of decision states plainly that it did in fact consider such evidence when it concluded that "the petitioner has failed to establish by clear and convincing

evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he [was] actually innocent of the crime of which he stands convicted." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 101 Conn. App. 470. The factual findings set forth in the court's memorandum of decision demonstrate that in assessing the petitioner's actual innocence claim, the court considered evidence, both from the criminal trial and from the habeas trial.

Allied to the petitioner's claim that the court did not consider the allegedly new evidence adduced at the habeas hearing, is his assertion that it was clearly erroneous for the court to accept the testimony of the police officers and to reject his brother's testimony as contrived. As an appellate court, we do not reevaluate the credibility of testimony, nor will we do so in this case. "The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Joseph* v. *Commissioner of Correction*, 117 Conn. App. 431, 433, 979 A.2d 568, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009). Upon an independent and scrupulous review of the record, we find that there is substantial evidence to support the court's conclusion that the petitioner failed to establish by clear and convincing evidence that he was actually innocent of the crimes of which he was convicted.

The petitioner also faults the court for not explicitly making a determination regarding the second prong of *Miller*, which requires that he must prove that "after considering all of [the] evidence and the inferences drawn therefrom . . . no reasonable fact finder would find the petitioner guilty of the crime." *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 747. The petitioner appears to suggest that the court should have

taken at face value all of the habeas testimony and the criminal trial testimony, especially his brother's testimony and the alibi evidence from the criminal trial, and determined, on the basis of that evidence, whether a jury would have found the petitioner guilty. This misreading of *Miller* neglects the significance of the two part test. In order to get to the second prong, the court must first determine that there is clear and convincing evidence that the petitioner is actually innocent. Here, the court reached the contrary conclusion that the petitioner did not prove his actual innocence by clear and convincing evidence. Accordingly, there was no occasion for the court to consider *Miller*'s second prong regarding the likely reaction of a jury to such evidence. Because the petitioner must satisfy each prong of the test in order to prove actual innocence, we conclude that it was not necessary for the court to reach the second prong in this instance. See *Wilson* v. *Commissioner of Correction*, 104 Conn. App. 224, 247, 932 A.2d 481 (2007). Accordingly, the petitioner's claims regarding his assertion of actual innocence fail.

## II

The petitioner next claims that the habeas court improperly concluded that he was not deprived of his right to the effective assistance of counsel. Specifically, the petitioner claims that he was prejudiced because his trial counsel failed to pursue a motion to suppress Inconiglios' in-court and out-of-court identifications of him. We are not persuaded.

Initially, we set forth the well established standard of review for claims of ineffective assistance of counsel. "Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by [an appellate] court unfettered by the clearly erroneous standard." (Internal quotation marks

omitted.) *McCown* v. *Commissioner of Correction*, 113 Conn. App. 117, 119, 966 A.2d 271, cert. denied, 292 Conn. 902, 971 A.2d 689 (2009).

"To determine whether the petitioner has demonstrated that counsel's performance was ineffective, we apply the two part test established in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)." *McCown* v. *Commissioner of Correction*, supra, 113 Conn. App. 119. According to *Strickland*, "[a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied." (Internal quotation marks omitted.) *Turner* v. *Commissioner of Correction*, 118 Conn. App. 565, 568, 984 A.2d 793 (2009), cert. denied, 296 Conn. 901, 991 A.2d 1104 (2010). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Davey B.* v. *Commissioner of Correction*, 114 Conn. App. 871, 876, 971 A.2d 735 (2009).

In accordance with the test set forth in *Strickland*, we first address whether the habeas court correctly determined that the petitioner's trial counsel, Tara Knight, provided reasonably competent assistance, such that it was within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. "In order to show ineffective assistance for the failure to make [or proceed with] a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." (Internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 120 Conn. App. 412, 428, 991 A.2d 705 (2010). After a careful review of the record, we conclude that the court correctly determined that counsel's performance was reasonably competent.

The following facts are relevant to our resolution of the petitioner's claim. Five days before the start of the petitioner's criminal trial, Knight filed a motion to suppress the police identifications of the petitioner. Two days later, however, Knight asked to withdraw the motion and informed the trial court that "I discussed it with [the petitioner], and for tactical reasons we are not pursuing it." (Internal quotation marks omitted.) Instead, Knight attempted to discredit the identification procedures through cross-examination of the police witnesses at trial. Knight confronted Burrell with certain discrepancies in his police report, most significantly, the fact that his report, dated December 11, 2000, noted that Inconiglios had selected the petitioner out of a photographic array as being the individual from whom she purchased crack cocaine, despite the fact that Inconiglios' identification did not occur until December 20, 2000. Knight also established that Burrell's report stated that members of the police narcotics team stopped a man matching the description provided

by Inconiglios and identified the man as the petitioner, when in fact no one stopped the petitioner or anyone else for that matter. Knight also raised as an issue the fact that Inconiglios had been involved in two other undercover roles during the relevant time period and suggested that she may have been confused.

At the habeas trial, the petitioner alleged that any reasonably competent attorney would have pursued the motion to suppress and that if the motion had been pursued, Inconiglios would not have been able to testify regarding her identification and the result of the proceedings would have been different. The habeas court rejected this claim. The court specifically credited Knight's testimony that she did not believe that the petitioner had a good chance of succeeding on the motion to suppress and that by litigating the motion, she would have given the police witnesses a dry run through the questions that she was planning to pose at trial. The court agreed with Knight's assessment regarding the merits of the motion to suppress and had no quarrel with Knight's strategic choice not to pursue the motion.

In its assessment of this issue, the habeas court accurately discussed and correctly applied the two-pronged test used when determining whether an identification should be suppressed. First, the court determines whether the identification was unnecessarily suggestive and, second, if so, the court makes an assessment whether the identification was reliable, despite its suggestiveness. See *State* v. *Randolph*, 284 Conn. 328, 384, 933 A.2d 1158 (2007). In assessing the likelihood that the petitioner's motion to suppress would have been successful had it been pursued, the court found that there was nothing particularly suggestive about the photographic array that was presented to Inconiglios. The court observed that the eight individuals included in the array all had reasonably similar appearances and

that there was no evidence that any police officer told Inconiglios anything about the petitioner or who would be in the array prior to her identification. Additionally, the court credited Burrell's testimony that although his report was dated on December 11, 2000, he completed it over two days, starting it on December 11 and completing it on December 20, after Inconiglios had made the identification.[3]

The habeas court found that the motion to suppress could have been denied solely on the ground that it was not unnecessarily suggestive. The court noted, as well, that even if a motion had been filed and the trial court had reached the second prong, the petitioner did not demonstrate that the identification was unreliable. The habeas court found that Inconiglios had viewed the suspect face to face in the daylight for approximately thirty seconds[4] and that because Inconiglios knew she would have to provide her fellow officers with a description of the suspect and make a subsequent identification, she made a conscious effort to focus on

[3] The petitioner claims that the habeas court's finding that Burrell's testimony was credible was clearly erroneous due to the fact that Burrell and Canning both testified that Burrell's police report was inaccurate. The petitioner conflates accuracy with honesty. The fact that Burrell may have made mistakes on his report does not mean that he was untruthful when he testified before the court. Moreover, "[t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Joseph* v. *Commissioner of Correction*, supra, 117 Conn. App. 433.

[4] The petitioner disputes the habeas court's factual finding that Inconiglios viewed the suspect for thirty seconds, noting that the entire transaction only took thirty seconds. While the petitioner may be correct that Inconiglios did not have her eyes trained on the suspect's face for the entire transaction, she testified that based on her training and the fact that she knew she would need to make an identification after the transaction had been completed, she had made special note to get a good look at the suspect's face. Thus, any small difference between the actual number of seconds that Inconiglios viewed the suspect's face and the thirty seconds found by the court is of no significance.

the suspect's appearance. The court noted that Inconiglios testified that she would not have made the identification if she had not been 100 percent certain.

The habeas court credited Knight's testimony that she weighed the likelihood of success on the motion to suppress against the tactical advantage that she would gain by being able to cross-examine the police officers at trial without having provided them a preview of the questions she intended to ask. The court found that Knight used this tactical advantage effectively by surprising the state with the discrepancies in Burrell's report and then arguing during closing argument that this was evidence of a " 'sloppy investigation' " that was " 'fraught with problems.' " The court noted, as well, that this tactic contributed to a prosecutorial impropriety during rebuttal argument to the jury and prompted a question from the jury during its deliberation, which led to a motion for a mistrial. The court found that, although these events ultimately did not save the petitioner from conviction, it was clear that Knight's tactical choice had the "potential to derail the state's case." The court, citing *Williams* v. *Bronson*, 21 Conn. App. 260, 266, 573 A.2d 330 (1990), noted that "[a] decision of counsel to try to discredit an identification through cross-examination rather than through a motion to suppress may be a sound decision. . . . Whether to afford a witness an opportunity to rehearse his testimony at a suppression hearing, especially when the prospects of suppression are negligible, is very much a tactical decision, not easily characterized as ineffective assistance of counsel." (Citations omitted; internal quotation marks omitted.) Likewise, the court concluded that Knight's decision to forgo a motion to suppress was a valid trial strategy, and, therefore, rejected the petitioner's claim of ineffective assistance of counsel.

On appeal, the petitioner claims that the motion to suppress was likely to have been successful, as the

identification by Inconiglios was unnecessarily suggestive and unreliable. In support of his claim, the petitioner asserts a fusillade of alleged defects in the identification procedures. These claims can generally be divided between those that center on Anastasio and those that involve Inconiglios. As to Anastasio, the petitioner claims that the identification was unreliable because Anastasio did not get a good look at the individual who matched Inconiglios' description because he was twenty-five feet away, the suspect was standing behind three other men and was only visible from straight on because he was standing near the opening of an alley way. He also alleges that while Anastasio claimed to have been familiar with the petitioner from the neighborhood, Anastasio did not know that the petitioner had gold caps on his front six teeth. He also did not complete a police report. The petitioner also asserted the fact that Anastasio did not have much contact with Ernest Sargent, even though he did testify to sometimes seeing him in the neighborhood.

As to Inconiglios, the petitioner further claims that when Anastasio radioed Canning to provide the name of the individual who matched Inconiglios' description, Inconiglios was still with Canning at the arranged meeting place.[5] The petitioner also suggests that there was some impropriety on the part of the police because Burrell's report, dated December 11, 2000, indicated that Inconiglios had selected the petitioner's photograph out of an array, when Inconiglios did not select the photograph from the array until December 20, 2000. Based on Anastasio's identification of the petitioner as the individual who sold the cocaine to Inconiglios,

---

[5] Even if we assume that the petitioner proved that Inconiglios was still present when the call was relayed to Canning, which the habeas court did not find, he does not explain how this would bear on the suggestiveness or the reliability of Inconiglios' subsequent identification of the petitioner from a photographic array.

Burrell placed the petitioner's photograph in the array that he showed to Inconiglios. The petitioner also questions the reliability of the Inconiglios identification based on Inconiglios' testimony that she had assumed that a photograph of the suspect would be in the array.

Upon a review of the record, we conclude that the court properly rejected the petitioner's claim of ineffective assistance of counsel. Although, the petitioner raises a number of issues relating to the police identification procedures, none provides us with a ground for concluding that a motion to suppress would have been successful. At the outset in this part of our review, we note that the petitioner argued before the habeas court only that Inconiglios' identification should have been suppressed. Thus, the issues raised regarding Anastasio's role in the identification only relate to how the petitioner's photograph was made part of the array that was shown to Inconiglios, and it does not bear on the suggestiveness or reliability of Inconiglios' identification of the petitioner. In terms of Inconiglios' identification, there is no evidence to suggest she was coached, that she was provided information prior to making the identification or that there was anything suggestive about the photographs used in the array. In sum, the court properly concluded that the petitioner had a low likelihood of success had Knight chosen to pursue the motion to suppress. Because the petitioner failed to prove that the motion was meritorious, he also failed to show that Knight's performance was not reasonably competent. Further, because the petitioner failed to establish the first prong of the *Strickland* test, we need not address the second prong. Accordingly, the petitioner's claim of ineffective assistance of counsel must fail.

III

The petitioner finally claims that the habeas court improperly failed to consider relevant evidence. The

petitioner attempted to introduce evidence that certain New Haven police officers, who were not involved in the petitioner's case, falsely accused another New Haven resident of a drug offense due to a mistaken identification. The court excluded this evidence of the basis of relevance. The petitioner claims that this evidence should have been admitted to show that "there have been intentionally flawed police reports and misidentifications of suspects in connection with narcotics investigations in the Kensington [Street] area." We are not persuaded.

The following additional procedural facts are relevant to the petitioner's claim. At the habeas trial, the petitioner attempted to introduce testimony from Marvin Conner, who was expected to testify that while being held at Roger Sherman House, a halfway house in New Haven, he was accused of numerous drug offenses, including possession of narcotics with intent to sell, which the police alleged to have occurred at 88 Kensington Street in October, 2006. The police report related to Conner's arrest indicated that an officer saw Conner engaged in the sale of narcotics and that the officer claimed that he was familiar with Conner from the neighborhood. Conner claimed that this was impossible because during the entire two years that the officer had been a police officer, Conner had been incarcerated. The case against Conner was eventually dismissed. The officer who authored the proffered police report was not involved in this case, but he was under the supervision of Canning, who was the supervisor in this case. The petitioner alleged that Conner's testimony was relevant to this case due to the similarities between Conner's case and this case.

The habeas court did not allow the police report or Conner's testimony into evidence. The court explained that "[t]he fact that the New Haven police may have made a mistake in identification in [another] case does

not bear heavily on whether there was mistaken identification in this case, at least absent more similarities between the two identifications. . . . [I]n these cases, different officers made the identifications. There's no evidence . . . of any influence that Sergeant Canning, who may have been in common in both cases, had on the officer who made the identification. . . . [I]t doesn't seem to me that the possibility that there might have been [a] mistake by the New Haven police department in an identification . . . justifies, essentially, a minitrial on that identification procedure. . . . I'm interested in all of the evidence that's relevant to this identification. But I'm not going to allow the trial of another identification."

We first set forth our well established standard of review regarding evidentiary claims. "[E]videntiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *McClean* v. *Commissioner of Correction*, 103 Conn. App. 254, 260, 930 A.2d 693 (2007), cert. denied, 285 Conn. 913, 943 A.2d 473 (2008).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree,

so long as it is not prejudicial or merely cumulative." (Citations omitted; internal quotation marks omitted.) *State* v. *Allen*, 289 Conn. 550, 562, 958 A.2d 1214 (2008).

Here, the evidence proffered by the petitioner was that a New Haven police officer allegedly made a mistaken identification in a drug case, regarding a suspect named Conner. This police officer stated in his report that he knew Conner from the neighborhood, when he allegedly did not in fact know him. The petitioner claims that the information in the police report was similar to this case in that Anastasio testified to being familiar with the petitioner from the neighborhood, insinuating that the members of the New Haven police department routinely only claim familiarity in order to bolster their identifications of suspects. The petitioner also argues that Conner's testimony was relevant because, just as in this case, the crime for which Conner was arrested took place on Kensington Street, and Canning was the supervisor of the officers in both cases.

Upon review of the record, we conclude that the court did not abuse its discretion in determining that the connection between the proffered evidence and this case was too tenuous to be probative. The fact that a New Haven police officer, who played no role in this case, *may* have made a mistaken identification in another case or *may* have included inaccurate information in his police report, has no bearing on the reliability of the eyewitness identification attested to by Anastasio or the identification from the photographic array made by Inconiglios. Neither Anastasio nor Inconiglios participated in the investigation or arrest of Conner, and any mistakes that may have occurred in that case are not probative of the claims in the case at hand regarding the officers' respective identifications. The facts that the cases both arose from events on Kensington Street and that Canning was the supervisor of the officers in

both cases, without more, are not more than coincidental.

The judgment is affirmed.

In this opinion the other judges concurred.

\* The listing of judges reflects their seniority status on this court as of the date of oral argument.